*Rules and Decisions*

---

Recently Filed Disciplinary Decisions and Complaints | Home

## DECISION FROM DISCIPLINARY REPORTS AND DECISIONS SEARCH

*Filed April 23, 1999*

### BEFORE THE HEARING BOARD
### OF THE
### ILLINOIS ATTORNEY REGISTRATION
### AND
### DISCIPLINARY COMMISSION

In the Matter of:

**RICHARD M. COLOMBIK,**   Commission No. 95 CH 947

Attorney-Respondent.

No. 3126983.

### REPORT AND RECOMMENDATION OF THE HEARING BOARD

### INTRODUCTION

On September 25, 1997 an order was entered in this matter by a Panel of the Hearing Board allowing the Joint Motion to File A Petition to Impose Discipline on Consent. On November 25, 1997 the Supreme Court denied the Administrator's Petition to Impose Discipline on Consent and this matter was then remanded and re-assigned to a new Panel of the Hearing Board. The hearing on this matter was held on October 8, 1998, at the offices of the Attorney Registration and Disciplinary Commission, One Prudential Plaza, 130 East Randolph Drive, Suite 1100, Chicago, Illinois before a Panel of the Hearing Board consisting of David F. Rolewick, Chair, Joseph A. Bartholomew, lawyer member, and Donn F. Bailey, public member. Robert J. Verrando appeared on behalf of the Administrator. George B. Collins and Theresa M. Gronkiewicz appeared on behalf of the Respondent who was present during the proceedings.

PAGE 2

### THE PLEADINGS

The Complaint

In a three count Third Amended Complaint filed against the Respondent pursuant to Supreme Court Rule 753 (b) on January 6, 1998, the Administrator charged the Respondent with a series of actions arising from his management as a general partner, and as attorney, of United Holsteins I Limited Partnership "UH-I". The Complaint alleges in detail, that the Respondent transferred funds of UH-I into the bank account of a corporation owned by the Respondent's father-in-law. The corporation was known as Rockefeller Depository, Inc. "RDI". The Respondent is charged with using UH-I investor funds inappropriately to satisfy his own business and personal obligations. The Respondent is charged with violating the following Illinois Rules of Professional Conduct: 1) conversion **(Count I)**; 2) breach of fiduciary obligations he owed to the various investors in the limited partnerships **(Count I)**; 3) accepting

employment where the exercise of the lawyer's independent professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property or financial interest **(Count I);** 4) entering into a business transaction with a client where the lawyer and the client have conflicting interests therein and where the client expects the lawyer to exercise his professional judgment therein for the protection of the client **(Counts I-II);** 5) accepting and continuing multiple employment where the exercise of the lawyer's independent professional judgment on behalf of the client will be or is likely to be adversely affected by his representation of another client **(Counts I-II);** 6) conduct involving dishonesty, fraud, deceit or misrepresentation **(Counts I and III);** 7) conduct which is prejudicial to the administration of justice **(Counts I and III);** 8) conduct which tends to defeat the administration of justice or to bring the courts or the legal

PAGE 3

profession into disrepute **(Counts I and III)**; 9) representing a client in the same or a substantially related matter in which the client's interests are materially adverse to the interests of a former client **(Count III);** and 10) making a statement of material fact or law which the lawyer knows is false, in appearing in a professional capacity before a tribunal **(Count III)**.

The Complaint further charges that the Respondent violated the following Rules before 1990: 1) accepting employment where the exercise of the lawyer's independent professional judgment on behalf of his client will be or reasonably may be affected by his own business, property or financial interest **(Count III)**; 2) failure to represent a client with undivided fidelity **(Count III)**; 3) conduct which is prejudicial to the administration of justice **(Count III)**; and 4) conduct which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute **(Count III)**.

The Answer

On May 20, 1998, the Respondent filed an Amended Answer to the Administrator's Third Amended Complaint. The Respondent disputes most of the substantial allegations in the complaint and specifically denies violating any of the Illinois Rules of Professional Conduct. Additionally, the Respondent presented affirmative defenses to all counts in the amended answer and requested that the Third Amended Complaint be dismissed. The Administrator filed an Answer to the Respondent's Affirmative Defenses. In such answer, the Administrator denied each of the affirmative defenses presented by the Respondent.

**EVIDENCE**

The Administrator's evidence consisted of Exhibits 1, 2a, 2b, 2c, 3-5, 6a, 6b, 6c, 7, 15 and 17. The Administrator also presented the testimony of Steven Abern, Stanley Rozewski and the

PAGE 4

Respondent as an adverse witness. The Respondent's evidence consisted of Exhibits 1-3 and 6-18. The Respondent also presented the testimony of Judge John Tourtelot, James Driscoll, Michael Erde, Leonard S. DeFranco, Stephen Baime, the Respondent and the joint stipulation regarding the character testimony of Judge Francis Gembala.

Stipulation Regarding The Testimony of Certain Witnesses

Counsel for the Administrator and Counsel for the Respondent stipulated that the following facts could be proven by clear and convincing evidence:

1.  Robert Nicolazzi, John Honsinger, Henry Burkitt, Craig Carpenter, Nancy Churchill, Betty Crebs, Robert Dalton, Robert Gabrysiak, Joseph Lamb, Keith Rojek, Benjamin Schwartz, Leonard Silverstein, David Sunderman, Robert Vitek, Bradley Weiss, and Irvin Weiss would, if

called and sworn as witnesses in this matter, testify as follows:

    a.   they each invested at least $11,000 in UH-I in or after 1983, as did other investors;

    b.   at the time they made their investments, they each knew that Respondent was an attorney;

    c.   prior to Respondent's resignation as general partner of UH-I in February 1987, they did not know of the existence of RDI;

    d.   prior to Respondent's resignation as general partner of UH-I in February of 1987, they did not know of Respondent's transfer of funds from UH-I's bank accounts to RDI's bank account;

    e.   prior to Respondent's resignation as general partner of UH-I in February of 1987, they did not know of the expenditures from RDI's bank account which are described in paragraphs 10 through 31 of the Administrator's Third Amended Complaint and which are evidenced in Administrator's Exhibits One and Two.

    f.   prior to Respondent's resignation as general partner of UH-I in February of 1987, they did not know of Respondent's purchase of an automobile (described in paragraphs 10 through 14 of the Administrator's Third Amended Complaint) or

PAGE 5

    of Respondent's subsequent sale of that automobile to his father (described in paragraphs 33 and 34 of the Administrator's Third Amended Complaint);

    g.   prior to Respondent's resignation as general partner of UH-I in February of 1987, they did not know that Respondent's wife, Ellen Colombik, had signature authority in bank accounts into which Respondent had deposited or transferred funds from UH-I's bank account;

    h.   they each received no return on their investment in UH-I, but did receive tax deductions from losses they incurred, as projected. (_See_, Admin. and Resp. Ex. 17)

Introduction

    The Respondent testified he graduated from John Marshall law school with honors in 1980. While attending evening classes at law school, the Respondent was a certified public accountant for the private tax staff of the Henry Crown family. The Respondent also testified he has never been disciplined before, nor has the Supreme Court entered a disciplinary order against him. (Tr. 111-12, 177-78)

## COUNT I

    In 1981, the Respondent formed UH-I, an Illinois Limited Partnership with himself as the general partner, for the purpose of generating income through the management of tax shelter investments in registered dairy cattle and dairy cattle breeding. The minimum investment required under the offering memorandum of UH-I of potential investors to buy a unit was $11,200. The Respondent testified that approximately 27 people invested in 30 units of the UH-I Partnership. In that same year, the Respondent opened American National Bank of Arlington Heights accounts numbers 7012495-03 and 7012495-11 which were each entitled "United Holsteins" hereinafter referred to as "UH-I accounts". The Respondent was the only person authorized to draw checks on the UH-I accounts. The Respondent also drafted a private

PAGE 6

placement memorandum, limited partnership agreement and subscription agreements relating to UH-I ("the offering documents") with the intention of distributing the offering documents to

potential investors in order to solicit their investment as limited partners in UH-I. (Tr. 39-42, 122, Admin. Ex. 1-2, Resp. Ex. 1)

Under the terms of the offering documents, the Respondent informed potential investors of UH-I that the Respondent would serve as the general partner of UH-I, as attorney for the general partner and as accountant for the general partner and that the partnership would eventually make a profit. In 1983, the Respondent incorporated RDI as an Illinois corporation for the purpose of receiving funds from UH-I investors and generating federal income tax deductions for UH-I limited partners. The Respondent's former father-in-law, David Porges, was RDI's sole shareholder and officer. In incorporating RDI, the Respondent agreed to act as legal counsel and registered agent for RDI. The Respondent testified he did not think he contributed money to RDI after it was formed, but he was responsible for maintaining and filing RDI's corporate records with the Secretary of State. (Tr. 42,43, 46, Admin. Ex. 1, 3)

According to the Respondent, potential investors were not allowed to become limited partners without signing a copy of the offering documents which disclosed the following, "Purchasers are urged to consult with their legal, tax and financial advisors prior to making an investment in the partnership." The Respondent also disclosed that Mr. Frazin, his law partner, and he were, respectively, counsel to the partnership and general partner. The offering documents further provided, "They are not independent to this transaction. Their interest may directly conflict with the best interests of other limited partners." and "Mr. Colombik is not independent with respect to this venture . . . . The projections are not guaranties, and there can

PAGE 7

be no assurances that any of the potential benefits described will occur." The offering documents did not guaranty any income or residual income would be realized by the limited partners. The Respondent further testified he informed potential investors of their need to consult their own independent attorney, accountant or an advisor. (Tr. 119-120, Admin. Ex. 1, p.15)

On November 28, 1983, the Respondent and his wife, Ellen Colombik, opened American National Bank of Arlington Heights accounts 7012511-03 and 7012511-11, which were each opened in the name of RDI and are hereinafter referred to as "the RDI accounts". The Respondent and Ellen Colombik were the only persons authorized to draw checks on the RDI accounts. (Tr. 48, Admin. Ex. 6c, p.1)

Between September 1983 and December 1986, several persons invested in UH-I under the terms of the offering documents authored by the Respondent and thereby became limited partners in UH-I. The Respondent deposited the funds he received from those investors into the UH-I accounts at American National Bank of Arlington Heights. (Admin. Ex. 2a-2c)

Between November 1983 and May 1986, without the knowledge of the limited partners of UH-I, the Respondent transferred over $100,000 from the UH-I accounts to the RDI accounts. The Respondent testified between 1983 through 1986, he viewed the money in the RDI accounts as his own money. The Respondent further testified that RDI owed him money from the money he deposited into the RDI account and from the funds he received from various entities. The Respondent testified the money was owed to him for his legal and management services. The Respondent also stated the UH-I partners were not aware of the tax code in effect at that time which prevented UH-I from taking a tax deduction for a payment to the Respondent because he was the general partner of UH-I. (Tr. 73-74) According to the Respondent, if RDI was not

PAGE 8

created, pursuant to the tax law in effect at that time, there would not have been a tax deduction for the investors of UH-I and therefore, UH-I would not be an effective tax shelter. But, since RDI's sole shareholder was the Respondent's former father-in-law, and not the Respondent, the

tax deductions taken by UH-I would be considered legitimate by the IRS. The Respondent stated the UH-I partners were not aware of the formation of RDI and were not aware that the monies he received on behalf of UH-I went to RDI. The Respondent did not inform the limited partners of the formation of RDI because he thought it was unnecessary. However, the partners did receive a financial statement in 1985 and tax returns for the following years of the investment period. According to the Respondent, the use of RDI was not "disallowed" by the IRS. (Tr. 44, 54, 57, 72-74, 124-25, 149-50, Admin. Exs. 3-4, Resp. Exs. 7, 15)

The Respondent testified that he sometimes advanced money to RDI which he considered loans to RDI. The Respondent also stated he never concealed the identity of RDI to the limited partners. (Tr. 126-27, 129, Resp. Ex. 8, 10-11)

The Respondent stated he used accounting principles to reconstruct the amount of money UH-I owed to RDI. The Respondent has no documentation or records regarding UH-I or RDI. According to the Respondent, the total aggregate amount owed as of December 31, 1986 was $193,250. When determining the amount, the Respondent reviewed all of the checks, bank statements, deposit slips, financial statements and tax returns provided to him by the Attorney Registration and Disciplinary Commission. The total amount owed ($193,250) from UH-I to RDI was based upon three amounts: 1) $118,575.50 RDI paid for embryo transplant fees; 2) $4,475.30 which was an advance from the prior financial statement; and 3) $70,200 which RDI paid on behalf of UH-I for one of the cows. After reviewing canceled checks and deposit slips

PAGE 9

from the ARDC, the Respondent testified in his opinion, RDI still owed him $110, 843.40. (Tr. 136-40, Resp. Exs.16-18)

From November, 1983 until April, 1987 the Respondent took funds from the RDI account for his or his wife's personal use amounting to $127,172.59. (Tr. 61, 139, 195, Admin. Ex. 6c, pp. 2, 3, 36, 42, 52, 65, 67 115, 117, 121, 149-50, 156-57, 162, 173-74, 192-93)

Testimony of Steven Abern

Steven Abern ("Abern"), a pediatric neurologist, testified in the early 1980s he invested money in UH-I. Prior to making the investment, Abern was aware that the Respondent was an attorney. (Tr. 76-77)

Abern testified that the Respondent also represented to him that in addition to the UH-I investment being a tax deduction, UH-I would also make a profit for the partners. Abern further testified he was aware UH-I had a bank account into which his investment checks were deposited and he believed his funds would be solely used for the UH-I partnership. (Tr. 77-78)

According to Abern, prior to the Respondent's resignation as general partner of UH-I in 1987, Abern was unaware that UH-I owed more than $30,000 to other clients of the Respondent, nor was Abern aware that UH-I had transferred the money to RDI's bank accounts. Abern also testified he did not know during this time period that the Respondent's wife, Ellen Colombik, had authority to write checks on the RDI bank accounts and Abern was unaware that the Respondent was using funds from the RDI bank accounts for his and his wife's personal use. (Tr. 72, 81-82)

Abern also testified that prior to the Respondent's resignation as general partner of UH-I, the partners realized they were not receiving their "K-1s" (income tax forms showing deductions

PAGE 10

and income from the partnership). Therefore, at a partnership meeting the Respondent was removed from his office as general partner. He was required to submit his resignation letter to

the partnership. (Tr. 82)

After the Respondent resigned as general partner, he filed a suit against the partnership. Abern then filed a claim against the Respondent after Respondent filed for bankruptcy. The Respondent also filed a Citation to Discover Assets against Abern, but the Respondent eventually dismissed the citation after he was sanctioned by the court. Abern also reached a settlement agreement with the Respondent after Abern filed a claim involving another partnership the Respondent formed which involved other cattle deals. As a result of his efforts Abern received $25,000. Abern also testified that after he invested in UH-I he received tax deductions, but not profits from his investments. (Tr. 82-85)

Testimony of Stanley Rozewski

Stanley Rozewski ("Rozewski"), an accountant, testified that prior to investing in UH-I, he knew the Respondent was an attorney involved in the partnership. (Tr. 93-94)

Rozewski also testified that at the time he invested in UH-I, the Respondent informed him that initially the partnership would incur losses from the start-up fees incurred by the partnership. However, the benefit of the losses incurred by the UH-I partners were the tax deductions they could take each year. According to the Respondent, in subsequent years, UH-I was to make a profit from the sale of cattle at auctions. Rozewski stated the only benefit he received from his investment were the tax deductions. Rozewski has never recovered the principal amount he invested in UH-I. (Tr. 93-94, 96)

Rozewski acknowledged he received a letter from UH-I. The letter stated that the IRS

PAGE 11

reviewed UH-I partnership and it passed the initial test of credibility for tax shelter purposes. (Tr. 105, Resp. Exs. 7, 15)

Rozewski also testified that when he invested in the partnership he expected his money would be used only for the purpose of the partnership. (Tr. 95)

Rozewski stated he did not know the Respondent resigned as general partner of UH-I, that UH-I owed more than $30,000 to other clients of the Respondent, or that Respondent eventually represented a client who filed suit against the partnership. Rozewski also stated that prior to 1987, he had not heard of RDI, nor was he aware that the Respondent made payments from UH-I to RDI. (Tr. 95-96)

On cross-examination Rozewski testified that at the time of his investment in UH-I, he understood the Respondent was entitled to management fees due to his services for UH-I and he did not think the Respondent was dishonest if he was paid for services he performed. Rozewski also assumed the Respondent could make a profit from the transactions entered into on behalf of UH-I. (Tr. 97-99)

Rozewski testified he does not know if any of the payments the Respondent received were improper and stated if the Respondent properly earned the money, he did not care how the money was spent. (Tr. 101-102)

The Respondent testified RDI owed him a substantial amount of money after his resignation which he has not received. The Respondent also testified the investors did not have difficulty with the deductions they received even though there was an audit since such audit was considered "very clean." (Tr. 141, 150)

PAGE 12

## COUNT II

In 1982, the Respondent agreed to represent Nita Cook to provide legal and accounting services regarding Cook's federal income tax liability and to provide Cook with investment advice. In 1983, the Respondent drafted and assisted Cook in funding the Nita Cook Trust with money contributed by Cook as grantor, and agreed to act as trustee of the Nita Cook Trust. (Tr. 63)

In December 1984, the Respondent informed Cook about UH-I and advised her to make a loan from her trust to UH-I. That same month, with Cook's consent, the Respondent, as trustee of the Nita Cook Trust, lent $15,000 from the trust to UH-I in consideration of a demand note executed by the Respondent as general partner and attorney for UH-I. The demand note executed by the Respondent required that UH-I pay interest at prime rate on the funds borrowed and that UH-I repay the principal upon demand, but not later than January 31, 1987. (Tr. 64, 159)

The Respondent testified he did not discuss Cook's loan to UH-I with any of the investors. The Respondent also testified he represented the Roberta Kerber Trust and that trust also made a loan to UH-I. The Respondent stated he made interest payments from UH-I to both the Cook and Kerber Trusts. (Tr. 64)

The Respondent testified that after he withdrew from representing Cook, he continued as the trustee because Cook did not want him to resign. The Respondent also continued to provide Scott Barber, the attorney for the trust, with any information which was requested. (Tr. 190-191)

The Respondent testified that he still does legal work for Cook. (Tr. 157)

PAGE 13

## COUNT III

On April 1, 1987, the Respondent resigned as general partner of UH-I. (Tr. 82)

In October 1987, UH-I had not paid the amounts due to the Cook Trust under the December 1984 demand note. In October 1987, the Respondent agreed to represent Cook and the Nita Cook Trust to seek recovery of the funds UH-I had agreed to pay under the note. On October 29, 1987, the Respondent prepared, executed, and filed a complaint on behalf of the Nita Cook Trust in the Circuit Court of the Nineteenth Judicial Circuit in Lake County, Illinois, seeking payment from UH-I of the amount due under the note. That same day, the Respondent pursuant to the provision of the note, executed and filed in the Lake County case, no. 87 L 1241, a waiver of service of process on behalf of UH-I and a confession of judgment against UH-I in the amount of $19,484 which included the $15,000 loan from the Nita Cook Trust, $3,209 in interest and $1,275 in the Respondent's attorney's fees. (Tr. 157)

The Respondent testified that as soon as it was bought to his attention that he should not be suing UH-I on behalf of Cook due to a conflict of interest, the Respondent withdrew as Cook's attorney and hired Scott Barber as her new attorney. (Tr. 157-58)

In 1988 and 1989, the Respondent obtained a judgment against UH-I in case number 87 L 1241 and attempted to enforce the judgment by serving a citation to discover assets upon Steven Abern, who was a limited partner of UH-I. In 1990, Abern moved to vacate the judgment in the case and moved for summary judgment against the Nita Cook Trust. (Tr. 83-84)

In October 1991, in response to Abern's motion for summary judgment, the Respondent executed and filed with the court in case number 87 L 1241 an affidavit in which he stated the proceeds of the $15,000 loan from the Nita Cook Trust to UH-I "were used to meet the ordinary

PAGE 14

and necessary business expenses of UH-I", and that "at no time were the proceeds of the Note used to meet any of my personal obligations." The portions of the Respondent's affidavit were deemed false by the court and the Respondent was sanctioned under Rule 137 and was required to pay approximately $16,000 in damages to Abern. In particular, the court found paragraphs 9 and 10 of the affidavit contained false statements in that the Respondent used the proceeds of the note to meet his personal obligations. The Respondent admitted he used the money for his personal obligations, but claimed, "RDI owed it to him". The Nita Cook Trust loan proceeds were among the funds he had transferred from UH-I to RDI in 1984 and 1985 and he had used a substantial portion of these funds for his own and Ellen Colombik's personal and business purposes. (Tr. 83-84, 158, 160, Admin. Ex. 7)

## MITIGATING EVIDENCE

Judge Tourtelot, an associate judge of the Circuit Court of Cook County, testified on behalf of the Respondent. Judge Tourtelot has known the Respondent since the early 1980's, when they both served on the Board of Governors for the Northwest Suburban Bar Association. Judge Tourtelot testified the Respondent was the Chair of several Northwest Suburban Bar Association committees, including the budget committee. Judge Tourtelot testified he is aware of the Respondent's reputation for truth and veracity amongst the other bar members and such reputation is excellent. Judge Tourtelot also testified that he was not aware of the Respondent's cocaine use during the 1980's, but he became aware of the Respondent's use after he read the complaint filed against the Respondent by the ARDC. (Tr. 9-13)

James Driscoll testified that he has been an officer in the Lawyers Assistance Program "LAP". Driscoll is also a trained intervenor for LAP and he trains other people to become

PAGE 15

intervenors. Driscoll stated he has known the Respondent for at least ten years through the Respondent's legal work and since Driscoll is a board member and officer of the Northwest Suburban Bar Association. Driscoll was formerly the President of the Northwest Suburban Bar Association. Driscoll testified that the Respondent is a very hard worker and the Respondent's reputation for truth and veracity amongst the other bar association members is, "very, very high". (Tr. 179-81)

Michael Erde testified he knows the Respondent through their association with the Northwest Suburban Bar Association. Erde served on the Board of Governors for the Bar Association at the same time as the Respondent. Erde testified the Respondent's reputation for truth and veracity amongst other lawyers is very good. (Tr. 183-84)

Leonard S. DeFranco ("DeFranco") testified he is an attorney and he also served as the Chair of the Federal Tax Council of the Illinois State Bar Association ("ISBA"). DeFranco stated the Respondent preceded him as the Chair of the Federal Tax Council of the ISBA. DeFranco testified he knew the Respondent since they represented a mutual client and through their activities with the ISBA. DeFranco testified that among members of the legal community, the Respondent has a good reputation for truth and veracity. (Tr. 185-86)

In re Richard Colombik,  95 CH 947  (Hearing Board)          Lawyer Search Attorney          th Suburban Bar association with her members of

Counsel for the Administrator and Counsel for the Respondent stipulated that Judge Francis Gembala's testimony if he were called, and sworn in as a witness would be as follows:

PAGE 16

1.  Judge Francis Gembala is an Associate Judge for the Circuit Court of Cook County.

2.  Judge Gembala is currently assigned to the Domestic Relations Division.

3.  Judge Gembala knows Richard Colombik from Colombik's involvement in the Illinois State Bar Association;

4.  Judge Gembala first met Richard Colombik when Colombik served as Chairman of the Illinois Bar Association Federal Taxation Section council in 1992/1993. At that time, Judge Gembala was also a member of the Federal Taxation Section Council.

5.  Judge Gembala knows other individuals who also know Richard Colombik and is familiar with Colombik's reputation in the community for honesty, integrity, truthfulness and veracity and that he has never had a reason to question that reputation.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### COUNT I

We find that the Administrator proved by clear and convincing evidence that Respondent violated the following Illinois Rules of Professional Conduct: 1) conversion; 2) breach of fiduciary obligations he owed to the various investors in the limited partnerships; 3) entering into a business transaction with a client where the lawyer and the client have conflicting interests therein and where the client expects the lawyer to exercise his professional judgment therein for the protection of the client in violation of Rule 5-104(a); 4) accepting and continuing multiple employment where the exercise of the lawyer's independent professional judgment on behalf of the client will be or is likely to be adversely affected by his representation of another client in violation of Rule 5-105(a) and (b); 5) conduct which is prejudicial to the administration of justice in violation of Rule 1-102(a)(5); and 6) conduct which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute in violation of Supreme Court Rule 771.

We further find that the Administrator failed to prove by clear and convincing evidence that Respondent engaged in the following misconduct as to Count I: 1) conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 1-102(a)(4); and 2) accepting employment where the exercise of the lawyer's independent professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property or

PAGE 17

financial interest in violation of Rule 5-101(a).

### COUNT II

We find that the Administrator proved by clear and convincing evidence that Respondent violated the following Illinois Rules of Professional Conduct: 1) entering into a business transaction with a client where the lawyer and the client have conflicting interests therein and where the client expects the lawyer to exercise his professional judgment therein for the protection of the client in violation of Rule 5-104(a); and 2) accepting and continuing multiple employment where the exercise of the lawyer's independent professional judgment on behalf of the client will be or is likely to be adversely affected by his representation of another client in violation of Rule 5-105(a) and (b).

### COUNT III

We find that the Administrator has proven by clear and convincing evidence that Respondent violated the following Illinois Rules of Professional Conduct prior to August 1, 1990: 1) failure to represent a client with undivided fidelity in violation of Rule 5-107(a); 2) conduct which is prejudicial to the administration of justice in violation of Rule 1-102(a)(5); and 3) conduct which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute in violation of Supreme Court Rule 771.

We further find that the Administrator proved by clear and convincing evidence that Respondent violated the following Illinois Rules of Professional Conduct after August 1, 1990; 1) representing a client in the same or a substantially related matter in which the client's interests are materially adverse to the interests of a former client in violation of Rule 1.9(a)(1); 2) making a statement of material fact or law which the lawyer knows is false, in appearing in a professional capacity before a tribunal in violation of Rule 3.3(a)(1); 3)conduct which is prejudicial to the administration of justice in violation of Rule 8.4(a)(5); and 4) conduct which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute in violation of Supreme Court Rule 771.

We find that the Administrator failed to prove by clear and convincing evidence that Respondent engaged in the following misconduct after August 1, 1990: conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4).

We find that the Administrator failed to prove by clear and convincing evidence that Respondent engaged in the following misconduct prior to August 1, 1990: accepting employment where the exercise of the lawyer's independent professional judgment on behalf of his client will be or reasonably may be affected by his own business, property or financial interest in violation of Rule 5-101(a).

PAGE 18

## RECOMMENDATION

The basic underlying facts in this matter were not in controversy. The majority of the panel considers the Respondent's conduct demonstrates his violation of all, but three, of the Illinois Rules of Professional Conduct charged in the Administrator's Complaint. The misconduct the Respondent engaged in was, in this panel's opinion, a series of serious transgressions which occurred, for the most part, more than a decade ago. The findings of this panel as to Counts II and III are unanimous and we will not elaborate on them further. However, some others relating to Count I, require our comment because on those findings this panel is divided.

The majority of this panel finds that there is clear and convincing evidence that Respondent breached his fiduciary obligations to UH-I as its general partner and attorney and also to UH-I's limited partners when he converted the investors' funds. To support the argument that the Respondent breached his fiduciary obligations, the Administrator cited Lapovitz v. Dolan, 189 Ill. App. 3d 402, 545 N.E.2d 304 (1989), in which the court held that in spite of any discretion afforded the general partner in the partnership documents, the general partner owes a duty of good faith and loyalty in dealing with the limited partners and a duty to exercise the highest degree of honesty, fairness and good faith in dealing with the limited partners and in handling their money and the partnership assets. The court further held that the general partner cannot avoid this duty by the language of his agreement with the limited partners. The Respondent, like the defendant in Lapovitz v. Dolan, cannot avoid his fiduciary obligations even if the Offering Memorandum which was distributed to each of the limited partners of UH-I

PAGE 19

included the following provision: ". . the general partner will not be held liable to the partnership or the Limited Partners since a provision has been made in the Partnership Agreement for indemnification of the general partner by the Partnership (but not the Limited

Partners personally) for liabilities resulting from errors of judgment or any acts or omissions whether or not disclosed." _See_ (Admin. Ex. 1, p. 28).

We consider this language to be inoperative for several reasons. The public policy of this state prohibits enforcement of indemnification for intentional conflict. Also, since we conclude that the Respondent's conduct as general partner and attorney raises his standard of conduct as general partner to the same level as his conduct as a lawyer, Supreme Court Rule of Professional Responsibility 1.8(f) applies to his conduct and he is prohibited from prospectively agreeing with his clients to limit his liabilities unless the client was independently represented.

Additionally, the Lapovitz court stated that: "in any fiduciary relationship the burden of proof shifts to the fiduciary (Respondent) to show by clear and convincing evidence that a transaction was equitable and just." _citing_ Bandringa v. Bandringa, 20 Ill.2d 167, 170 N.E.2d 116 (1960); Schueler v. Bloomstrand, 394 Ill. 600, 69 N.E.2d 328 (1946); and Grossberg v. Haffenberg, 367 Ill. 284, 11 N.E.2d 359 (1937) and the Lapovitz court further held that: ". . . where there is a question of breach of fiduciary duty of a managing partner, all doubts will be resolved against him, and the managing partner has the burden of proving his innocence". _See_ Saballus v. Timke, 122 Ill. App. 3d 109 at 117-18(1983), _citing_ Bakalis v. Bressler, 1 Ill.2d 72, 78, 115 N.E.2d 323 (1953). This Respondent has failed to overcome the burden of proving he did not breach his fiduciary obligations to UH-I and its' limited partners. The majority of the panel finds in the unique circumstances of this case the Administrator presented sufficient evidence that the

PAGE 20

Respondent was required to rebut. The burden shifted to the Respondent and he failed to adequately rebut the Administrator's evidence as he was required to do.

The majority of the panel finds that the Respondent breached his fiduciary obligations directly to the UH-I Limited Partnership when he received loans for UH-I from his other clients without informing the investors of the transactions. Since the Respondent was the attorney and the only general partner of the client and as the attorney and as general partner choose to engage in a transaction which creates a waivable conflict of interest, he is incapable of exercising the waiver. The waiver must be informed and made by a unconflicted party. Waiver by the attorney/general partner in this setting is meaningless. The Respondent also breached his fiduciary obligation as general partner and attorney for UH-I when funds were over withdrawn by him, from the UH-I and RDI accounts in November, 1985 and December, 1985 respectively. At a time when he as a fiduciary was using partnership assets for his personal use (arguably because the partnership owed it to him) Respondent allowed and caused drafts on insufficient funds to be delivered to creditors of UH-I. Since the only evidence is that Respondent took over $100,000 from UH-I during a period of time the offering documents estimate only $60,000 in fees were due, we can only conclude this conduct amounts to conversion. Although the Respondent claims RDI owed him the monies he converted, the evidence demonstrates that approximately $100,000 of UH-I's funds were transferred to RDI without the Respondent providing any documentation as to why such transfers were made. The evidence also clearly shows that the Respondent has no recollection as to why any of the funds taken from the RDI account were transferred directly to him, or his wife, or their creditors. The Respondent admits he considered the RDI account his money.

PAGE 21

Supreme Court Rule of Professional Conduct 1.15 requires the Respondent as an attorney to keep safe and account for client property and to keep records for seven years (previously ten years). This he failed to do.

In finding that the Respondent converted the UH-I investors' funds, it is important to note that the Respondent's total management Adent and legal fees were estimated to be approximately $60,000 in the other offering documents, but the evidence reflects that the Respondent received over

$100,000 from UH-I's account through RDI's account which was mostly used to pay the Respondent's and his wife's personal obligations.

The majority of the panel is troubled by the Respondent's position that RDI was created as a legitimate company so that the UH-I Limited Partnership would allegedly receive a tax benefit. The Respondent's position is weak considering RDI is nothing more than a "sham" company. We find no evidence to support the Respondent's argument that RDI operated as a legitimate business. The evidence establishes that RDI's corporate books remained blank after the company's initial formation. Its owner and president did nothing for the company and could not even sign a check. The company's only function was to transfer money to the Respondent and his wife in a fashion which created tax deductible expenses which UH-I could not have deducted for tax purposes if the money were given directly to the Respondent.

Except as noted above, the existence of RDI is a not an issue for purposes of the majority finding and recommendations. The issue in Count I is whether the Respondent wrongfully transferred UH-I funds to himself in violation of his fiduciary duty to UH-I, his client and its limited partners. The majority of the panel finds that he did. That the funds were first transferred to the RDI accounts is of no importance here. We also note that the Letter from the IRS (Resp.

PAGE 22

Ex. 7) which relates to some other partnership is not an approval or condonation of the RDI ruse and is of no probative value in this matter.

Having found that the evidence demonstrates that the Respondent engaged in improper conduct alleged in the complaint, there is a sufficient basis for discipline. Although the Respondent testified he was experiencing stress during this time period due to his substance abuse, this panel finds this rationale unacceptable since the evidence shows his substance abuse occurred after the establishment of UH-I and the initiation of the conduct involved in this matter.

The Respondent has argued that his conduct in this case was not done in his capacity as a lawyer, but as a businessman, therefore, he should not be forced to perform at the higher standards required of lawyers. This argument requires a response. It appears that attorneys practice multiple professions even from their law office since there is no specific Illinois Rule of Professional Conduct prohibiting it, nor do the ABA Model Rules prohibit an attorney from engaging in dual professions, commentators generally agree dual practice is permitted *See* ISBA Opinion No. 90-32: *Topic: Dual Professions; Business Transactions with Clients (May 15, 1991)*; ISBA Opinion No. 89-14: *Topic: Dual Professions; Lawyer/Insurance Agent Providing Legal and Insurance Services to Same Client; Receipt of Insurance Commissions (April 4, 1990)*; and ISBA Opinion No. 85-3: *Topic: Dual Professions; Accounting Practice Combined with Practice of Law (October 4, 1985)*. However, the attorney who practices other business or professions from his law office must assume the burden of clearly defining his role or roles for his customers or clients. While the offering documents in this case were a good start, the testimony of the Respondent and even the argument of his counsel demonstrated the confusion this dual practice creates in the mind of even the practitioner. The Respondent and his counsel referred to the limited partners

PAGE 23

of UH-I as the Respondent's "clients" during the hearing. How difficult it must be for an investor to differentiate. In this matter, as attorney for the partnership, we consider the Respondent was required to apply the Supreme Court Rules of Professional Responsibility to his conduct in relationship to UH-I and to its constituent limited partners because of the multiple conflicts he created by also serving as general partner and manager of the partnership. He created multiple fiduciary obligations, responsibilities and conflicts for himself. He cannot now claim that because he was not counsel to the limited partners, he can avoid the fiduciary duties

he sought as general partner and lawyer of the partnership or that his conduct as general partner need not conform to the ethical standards of the Rules. (*See* ABA Model Rules of Professional Conduct, Rule 5.7 and the commentary thereafter) But even if such an argument were accepted, the Respondent, as attorney for the partnership, has failed to conduct himself in conformity with the Supreme Court Rules of Professional Responsibility and there is no doubt he served and took partnership assets in that capacity.

The Supreme Court of Illinois has stated that, "[o]ur attorney disciplinary proceedings are designed to safeguard the public and maintain the integrity of the legal profession." In re Levin, 77 Ill.2d 205, 211, 395 N.E.2d 1374 (1979). "The Rules of Professional Conduct recognize that the practice of law is a public trust and lawyers are the trustees of the judicial system." In re Smith, 168 Ill.2d at 269, 287, 659 N.E.2d 896 (1995). The purpose of the disciplinary system is not to punish an attorney, but to safeguard the public and protect the integrity of the legal profession. In re Goldstein, 103 Ill.2d 123, 468 N.E.2d 959 (1984). Additionally, the final determination of appropriate sanctions in attorney disciplinary proceedings necessarily involves analysis of the unique facts and circumstances of the particular case. *See* In re Crisel, 101 Ill.2d

PAGE 24

332, 461 N.E.2d 994 (1984).

In determining the Respondent's discipline, this panel also considered the mitigating evidence that was presented. The Respondent has involved himself in numerous bar activities throughout his career and to his benefit, he also presented solid character witnesses who testified to the Respondent's honesty and integrity. Also, this panel is aware that four years is a significant amount of time to wait for a determination of one's future as an attorney, especially when the misconduct began in 1983. This panel believes that the Respondent's conduct was limited in its scope and will not be repeated again. The panel is unanimous in its finding that the evidence does not support a finding of fraud in violation of Rule 5-101(a) or 8.4(a)(4). There is no evidence the Respondent established UH-I or managed it to defraud the investors or that the conduct of UH-I's business conflicted with the Respondent's business interests or property. The evidence rather shows a pattern of disregard for professional responsibility combined with mismanagement, poor record keeping which was subsequently magnified by substance abuse. The Respondent's testimony that he is recovering from substance abuse and is capable of assuming the responsibility of practicing is not challenged by the Administrator's Counsel with argument or evidence and the Administrator has not asked for probation, monitoring or that special obligations be placed on the Respondent in that regard.

The Administrator recommends that the Respondent be suspended from the practice of law for at least eighteen months as was the imposed discipline in In re Parisi, 94 CH 219 (1994). Whereas, Counsel for the Respondent suggests that the Respondent be discharged, even if he did engage in some form of misconduct. The Administrator cites six cases in support of her request that the Respondent be suspended from the practice of law for eighteen months. Although these

PAGE 25

cases are not all factually on point given the Respondent's unique misconduct, we find the language of In re Parisi instructive. Parisi involved several of his former clients in a real estate investment partnership in which he had an interest and was acting as the partnership's attorney. Similarly, this Respondent, like Parisi, also solicited investments from some of his former clients. Parisi also concealed some of the encumbrances of the real estate partnership assets. Parisi, like the Respondent, used the partners' funds (which were held in escrow) for unauthorized purposes; however, Parisi, unlike the Respondent, fraudulently obtained some of the partners' signatures for guaranties of the investment's mortgage debt. In suspending Parisi from the practice of law for eighteen months, the court held that although Parisi did not currently have an attorney-client relationship with the partners he did have a fiduciary obligation

to them which he failed to meet. This Respondent's misconduct is similar to Parisi's misconduct, but is less egregious in that the he did not forge signatures. Therefore, this panel believes in light of the nature of the Respondent's actions, the mitigating evidence presented and the fact that the last acts of misconduct occurred approximately eight years ago, a less severe sanction is warranted than given in the <u>Parisi</u> decision.

## CONCLUSION

Therefore, due to the nature of the Respondent's misconduct along with the mitigating circumstances, including, but not limited to, the significant amount of time which has lapsed since the Respondent engaged in this misconduct, this Panel recommends that the Respondent be suspended from the practice of law for a period of ninety days.

DATE: 23 April 1999

_____
David F. Rolewick, Chair of the Hearing Panel, with Donn F. Bailey, Hearing Panel Member, concurring.

_____

PAGE 26

## DISSENTING OPINION

I dissent with respect to the majority panel members' findings of fact, conclusions of law and recommended sanction. While I agree with the majority that Respondent's conduct involved violating the following Rules as to Counts II and III: 1) entering into a business transaction with a client where the lawyer and the client have conflicting interests therein and where the client expects the lawyer to exercise his professional judgment therein for the protection of the client in violation of Rule 5-104(a); 2) accepting and continuing multiple employment where the exercise of the lawyer's independent professional judgment on behalf of the client will be or is likely to be adversely affected by his representation of another client in violation of Rule 5-105(a) and (b); 3) failure to represent a client with undivided fidelity in violation of Rule 5-107(a); 4) conduct which is prejudicial to the administration of justice in violation of Rule 1-102(a)(5);5) conduct which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute in violation of Supreme Court Rule 771; and Respondent violated the following Illinois Rules of Professional Conduct after August 1, 1990; 1) representing a client in the same or a substantially related matter in which the client's interests are materially adverse to the interests of a former client in violation of Rule 1.9(a)(1); 2) making a statement of material fact or law which the lawyer knows is false, in appearing in a professional capacity before a tribunal in violation of Rule 3.3(a)(1); 3) conduct which is prejudicial to the administration of justice in violation of Rule 8.4(a)(5); and 4) conduct which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute in violation of Supreme Court Rule 771;

PAGE 27

I would impose a lesser sanction upon Respondent than recommended by the majority.

I cannot agree with the majority that Respondent, by clear and convincing evidence, breached his fiduciary obligations to UH-I as its general partner and attorney. Nor can I find that Respondent converted the investors funds. In my opinion, the Administrator not only failed to meet her burden in proving by clear and convincing evidence that Respondent engaged in conversion and breached his fiduciary obligations, to UH-I's limited partners, the Administrator also incorrectly argued in citing the <u>Lapovitz v. Dolan</u> decision in closing argument that "in any fiduciary relationship the burden of proof shifts to the fiduciary to show by clear and convincing

evidence that a transaction was equitable and just." *See* <u>Bandringa v. Bandringa</u> at 167. I do not, and cannot, support the conclusion that in disciplinary proceedings the burden automatically shifts to the fiduciary (in this case the Respondent) to demonstrate that a transaction was equitable and just. Unlike a civil dispute, when a lawyer's license is at stake, the burden must remain on the Administrator, especially where the Administrator is never time-barred from filing a complaint. If the burden were to shift as the majority suggests, the Respondent here would be required to demonstrate (by what standard is unclear) the equitable nature of transactions which occurred over 15 years ago. However, even if the shift of burden to Respondent is appropriate in a disciplinary proceeding, I find that Respondent was not given ample notice of the shift in the burden, nor the opportunity to present evidence during the hearing to overcome this imposed burden of proof.

Additionally, I give greater weight than the majority to the mitigating evidence presented on Respondent's behalf during the hearing. It is undisputed that Respondent has participated in numerous bar activities throughout his career which is commendable; however, I cannot stress

PAGE 28

enough the enormous effect the lapse in time from when the alleged conduct first occurred to when Respondent was charged and brought to hearing has had on the weight I wish to give the recommended sanction. Since there are no statute of limitations given to guide the disciplinary process, this Respondent had to wait a significant amount of time to have this matter resolved. This factor alone in mitigation is significant since I, like the majority, find that Respondent's conduct was limited in scope and not fraudulent in nature. Therefore, based upon the mitigating factors, the disagreement with the standard of burden imposed, and the Rules Respondent violated, I recommend that Respondent receive a three month suspension which is stayed in full.

Date: 23 April 1999

_____
Joseph A. Bartholomew, Hearing Board Member, dissenting.

**End of Document**

Recently Filed Disciplinary Decisions and Complaints | Home

## DECISION FROM DISCIPLINARY REPORTS AND DECISIONS SEARCH

**M.R. 15958 - In re: Richard M. Colombik (September 29, 1999)**

Disciplinary Commission.

The motion by the Administrator of the Attorney Registration and Disciplinary Commission to approve and confirm the report and recommendation of the Hearing Board is allowed, and respondent Richard M. Colombik is suspended from the practice of law for ninety (90) days.

Respondent Richard M. Colombik shall reimburse the Disciplinary Fund for any Client Protection payments arising from his conduct prior to the termination of the period of suspension.

Order entered by the Court.

.

*In re* Richard Colombik, 95 CH 947 (Supreme Court Order)

Lawyer Search Attorney

| Next Doc | Previous Doc | Next Hit | Previous Hit | Return to Results Page | Edit Search |