IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**TLS MANAGEMENT AND MARKETING SERVICES LLC**,

    Plaintiff,

    v.

**RICKY RODRIGUEZ-TOLEDO**, *et al.*,

    Defendants.

Civil No. 15-2121 (BJM)

**OPINION AND ORDER**

    TLS Management and Marketing Services LLC ("TLS") brought this action against, among others, Ricky Rodriguez-Toledo ("Rodriguez"), ASG Accounting Solutions Group, Inc. ("ASG"), and Global Outsourcing Services LLC ("GOS"), alleging violation of, *inter alia*, the Industrial and Trade Secret Protection Act of Puerto Rico (the "Act"), P.R. Laws Ann. tit. 10 §§ 4131–4141. Docket No. 74. Claims arising under the Act, along with other state-law claims and claims arising under Title I of the Electronic Communications Privacy Act, survived defendants' motion to dismiss. Docket No. 173. TLS moved for preliminary injunctive relief under the Act against Rodriguez, ASG, and GOS, Docket Nos. 130, 134, 139-1, 145, 154, 175, and defendants opposed. Docket Nos. 136, 143, 158, 176. The case is before me on consent of the parties. Docket No. 93.

    For the reasons set forth below, preliminary injunctive relief is **GRANTED**.

**BACKGROUND**[1]

    TLS is a Puerto Rico limited liability company that employs tax lawyers, tax accountants, and business executives to provide tax planning and consulting services. Am. V. Compl. ¶¶ 11, 24. TLS has developed tax strategies, insurance strategies, customer lists,

---

[1] This account is drawn from the amended verified complaint, Docket No. 74, and the documentary evidence attached to the parties' filings. Docket Nos. 130, 134, 136, 139-1, 143, 145, 154, 158, 175, 176. TLS moved to have its motion decided upon the documentary evidence in the record, and defendants did not request an evidentiary hearing. Docket No. 130 at 4.

and other confidential information, and has stored that information on an online business account at the domain name "Dropbox.com" ("Dropbox").[2] *Id.* ¶¶ 60, 61. TLS's Dropbox is for the "exclusive use" of its employees, and Dropbox requires a business account to be used "in compliance with" an employer's "terms and policies." *Id.* ¶¶ 60, 75. ASG employs certified public accountants, and offers, among other things, tax planning and tax preparation services. *Id.* ¶ 26. Rodriguez previously served as ASG's "principal director," and Lorraine Ramos ("Ramos") remains a "principal" for ASG. *Id.* ¶¶ 13, 27, 65. In March 2012, TLS offered Rodriguez the company's "finance director" position, subject to his execution of a confidentiality and nondisclosure agreement. *Id.* ¶¶ 12, 28. Rodriguez accepted the offer, and was set to start the new position in August 2012. *Id.* ¶ 28.

Upon accepting this offer, Rodriguez executed a subcontractor agreement ("SCA") between TLS and ASG. *Id.* ¶ 29. Under the SCA, ASG was required to perform various tasks for the benefit of TLS, such as developing cash-flow and financial models that projected the value of TLS's services to prospective clients. *Id.* ¶ 30. The SCA prohibited ASG from disclosing confidential information, restricted the use of that information "for a purpose that is necessary in carrying out the provisions of th[e] agreement," and required ASG to inform TLS of any unauthorized disclosures of the confidential information. *Id.* ¶¶ 31–33. The SCA defines "confidential information" broadly to include information like TLS's business methods and procedures, costs, products, formulae, prices, marketing channels and relationships, prospective and executed contracts, identities of strategic partners, business arrangements, project plans, and clients or prospective clients. *Id.* ¶ 32. And works made for hire pursuant to the SCA were also classified as confidential under this agreement. *Id.* ¶¶ 34, 35. The SCA additionally required Rodriguez to return all confidential information upon the termination of his employment with TLS. *Id.* ¶ 40.

---

[2] Dropbox is "a web-based file hosting service that uses 'cloud' storage to enable users to store and share files with others across the Internet using file synchronization." *Frisco Med. Ctr., L.L.P. v. Bledsoe*, 147 F. Supp. 3d 646, 652 (E.D. Tex. 2015); *see also United States v. Wilson*, — F. Supp. 3d —, 2016 WL 6683268, at *2 (D.D.C. Nov. 14, 2016).

In July 2012, Rodriguez requested permission to start his employment at TLS in September 2012, and agreed to extend the SCA until that month. *Id.* ¶ 41. The following month, TLS offered Rodriguez a different position—the company's "managing director" position, so long as he signed a confidentiality and nondisclosure agreement (the "NDA"). *Id.* ¶ 42. Rodriguez's NDA prohibited him from disclosing confidential information. *Id.* ¶¶ 45, 47. The NDA, like the SCA, defined "confidential information" broadly. *Id.* ¶¶ 45, 47. Rodriguez accepted the offer and began working as TLS's managing director in early September 2012. *Id.* ¶ 42. To perform his duties, Rodriguez was issued a laptop, a TLS e-mail account, and company-issued equipment. *Id.* ¶ 50.

In January 2015, Rodriguez resigned from his employment at TLS. *Id.* ¶¶ 59, 78. After resigning, Rodriguez became GOS's managing director. *Id.* ¶ 82. Rodriguez formed GOS while he was still employed at TLS, and GOS currently competes with TLS. *Id.* ¶ 82; Docket No. 134-3. TLS later learned that, before Rodriguez resigned from TLS, he transferred many confidential documents, including a template of TLS's operating agreement, from TLS's Dropbox into a folder titled "Global Outsources Services." Docket No. 134 ¶¶ 6–9. A file within the GOS folder was titled, in Spanish, "Conversation Topics About New Business." Docket No. 134 ¶ 7. In this vein, Rodriguez hesitantly admits that "[d]uring his employment at TLS, he may have created a 'GOS' folder within . . . TLS['s] Dropbox account." Docket No. 136 at 5. And Rodriguez has also admitted that he and Ramos accessed TLS's Dropbox from a shared laptop. Docket No. 133-1 at ¶ 3. TLS commenced this action in August 2015, claiming, among other things, that Rodriguez has misappropriated TLS's confidential information.

## DISCUSSION

TLS contends that there is ample evidence to grant a preliminary injunction pursuant to the relief afforded by the Act. Docket Nos. 130, 134, 139-1, 145, 154, 175. Defendants raise various meritless arguments in asserting that preliminary injunctive relief is unwarranted. Docket Nos. 136, 143, 158, 176.

The federal standard for obtaining preliminary injunctive relief requires a plaintiff to demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *P.R. Hosp. Supply, Inc. v. Bos. Sci. Corp.*, 426 F.3d 503, 507 (1st Cir. 2005). A federal court may also grant an injunction pursuant to a pendent state-law claim. *See FDIC v. Antonio*, 843 F.2d 1311, 1313 (10th Cir. 1988)(district court could issue injunction "under [a] Colorado statute," making it unnecessary to "consider the injunction's validity under traditional equitable doctrines or" a federal statute); *Roe v. Operation Rescue*, 919 F.2d 857, 867 (3d Cir. 1990) ("injunction, which rests independently" on state-law grounds, "must be upheld regardless of the merits of" the federal claim); *N. Va. Women's Med. Ctr. v. Balch*, 617 F.2d 1045, 1049 (4th Cir. 1980) (same); *Leen v. Carr*, 945 F. Supp. 1151, 1153 (N.D. Ill. 1996) (although plaintiffs "sought a preliminary injunction only on their state law claim" and "the preliminary injunction hearing testimony addressed only the state law claim, jurisdiction is still proper.").

TLS has moved for a preliminary injunction pursuant to the Act rather than the federal claims alleged in the amended verified complaint. The Act provides that "[i]n all cases in which it is proven that an industrial or trade secret has been misappropriated, the court may issue a preliminary injunction order, *for which the plaintiff shall not be under the obligation to prove irreparable damages*." *Id.* § 4136 (emphasis added). Where a state law provides for injunctive relief and that relief is "not tied to a showing of irreparable injury," the court need not make findings as to that part of the test for injunctive relief. *See Waterproofing Sys., Inc. v. Hydro-Stop, Inc.*, 440 F.3d 24, 33 (1st Cir. 2006); *Pearl Investments, LLC v. Standard I/O, Inc.*, 297 F. Supp. 2d 335, 337 (D. Me. 2004) ("When state law defines the underlying substantive right, state law also governs the availability of such equitable remedies as a permanent injunction"); *Systema de P.R., Inc. v. Interface Int'l*, 23 P.R. Offic. Trans. 347 (P.R. 1989) (in the context of a request for preliminary injunctive

TLS Management and Marketing Services LLC v. Rodriguez-Toledo, *et al.*, Civil No. 15-2121 (BJM)      5

relief pursuant to Puerto Rico Law 75, P.R. Laws Ann. tit. 10, §§ 278–278d, which also does not require a showing of irreparable harm, "courts should apply the equity tests established in the classical injunction case law, tempered for purposes of Act No. 75.").

### A. Likelihood of Success

TLS contends that injunctive relief should be awarded because defendants have used or divulged confidential information that can be divided into four categories: TLS's (1) methods, systems, and procedures; (2) costs, prices, and formulas; (3) prospective and executed contracts and other business arrangements; and (4) agents, contractors, and partners. Docket No. 130 at 5. The Act provides that "[a]ny natural or juridical person who misappropriates a trade secret shall be held accountable for any damages caused to its owner." P.R. Laws Ann. tit. 10, § 4134. An "industrial or trade secret" is defined as "any information . . . [t]hat has a present or a potential independent financial value or that provides a business advantage, insofar as such information is not common knowledge or readily accessible through proper means by persons who could make a monetary profit from the use or disclosure of such information, and . . . for which reasonable security measures have been taken, as circumstances dictate, to maintain its confidentiality." *Id.* §§ 4132(a)–(b). The Act defines "information" as "[k]nowledge that broadens or clarifies knowledge already garnered. It includes, but is not limited to, any formula, compilation, method, technique, process, recipe, design, treatment, model or pattern." *Id.* § 4131(a).

"Measures that can be deemed to be reasonable to maintain the confidentiality of the trade secret include," *inter alia*, "requiring company employees authorized to access such information to sign confidentiality agreements," "establishing control measures for the use of or access to such information by company employees," or "implementing any technologically available measures when publishing or transmitting such information over the Internet, including the use of email, web pages, message boards, and any other equivalent medium." *Id.* §§ 4133(c), (g), (h). And "misappropriation" includes, among other things, "the disclosure or use of a trade secret belonging to another without his/her

TLS Management and Marketing Services LLC v. Rodriguez-Toledo, *et al.*, Civil No. 15-2121 (BJM)                6

express or implicit consent, by a person who . . . at the time of disclosure or use . . . knew or should have known that such trade secret was . . . obtained under circumstances from which a duty to maintain confidentiality or to limit use ensues." *Id.* § 4134(b)(2)(B).

In this case, because TLS kept its confidential information electronically stored in a Dropbox accessible only to its employees, and because Rodriguez signed the SCA and NDA, TLS took reasonable measures to maintain the confidentiality of its trade secrets. *See id.* § 4133(c), (g), (h). Rodriguez agreed in the SCA and NDA that the categories of information detailed above constituted TLS's confidential information, and so he likely knew or should have known that he was under a duty not to use or disclose documents in TLS's Dropbox or any other inside information gained while employed at TLS. *See id.* § 4134(b)(2)(B). And the information TLS underscores, which is detailed below, likely constitutes a "trade secret" because it is not "common knowledge" and it is likely that the information either has "a potential independent financial value" or "provides a business advantage." *Id.* §§ 4132(a)–(b). Indeed, after leaving TLS, Rodriguez used much of TLS's inside information, which is detailed below, in apparent attempts to eat TLS's lunch. This shows, at the very least, that the information likely "provides a business advantage."

TLS has proffered sufficient evidence to demonstrate that it can likely show that Rodriguez "misappropriated" confidential trade secrets after leaving TLS in January 2015. With respect to the first category of information described above, TLS has proffered sufficient documentary evidence to show that Rodriguez has divulged TLS's business methods, systems, and procedures after leaving his employment with TLS. A few examples will suffice. First, in June 2015, Rodriguez had conversations with TLS's clients in which he referenced TLS's business methods and procedures relating to lending, collateral, and insurance—namely—the portion of a formula that related to $50,000 charged by TLS in connection with the provision of certain services. Docket No. 130-2 at 3. Rodriguez disaggregated the $50,000 figure into two component parts and suggested that part of the fee charged was unnecessary and solely for the profit of TLS. *Id.* Second, in August 2015,

Rodriguez discussed TLS's organization and structure with Jay Harris ("Harris") and divulged that the "lack of business registration by TLS [in] a given state . . . has been used successfully in the past against them." Docket No. 130-22 at 1. Third, in September 2015, Rodriguez revealed to Bob Regnuso, a client of TLS, how TLS had handled the request of a different client of TLS. Docket No. 130-16 ¶ 4.

With respect to the second category of information, TLS has proffered sufficient documentary evidence to show that Rodriguez has improperly divulged TLS's costs, prices, and formulas to third parties. Two illustrative pieces of evidence suffice. First, in June 2015, Rodriguez disclosed the formula for calculating a $50,000 fee charged by TLS and suggested that part of the fee was unnecessary. Docket No. 130-2 at 3. Second, in June 2015, Rodriguez discussed with Harris the cost of various services charged by TLS and told him that certain services "should" have been charged at a different rate—saying, "Why is the expense account balance on TLS['s] Management Fee Expense only $1,800. It should be $10,000 . . . ." Docket No. 130-24 at 1. While Rodriguez highlights that TLS's clients were already aware of the fees charged, he has proffered insufficient evidence to show that TLS's clients or the public knew how TLS calculated its fees. Disclosing such information likely gave defendants a business advantage by nudging some of TLS's clients to end their business with TLS out of a perception that they were being incorrectly charged. Harris, for example, took his business elsewhere in June 2015—namely—to a company where Rodriguez was designated an "authorized person." Am. V. Compl. ¶¶ 83, 84.

With respect to the third category of information, TLS has adduced enough evidence to show that Rodriguez has divulged information relating to its executed contracts and other business arrangements. For example, in August 2015, Rodriguez discussed with TLS clients the provisions of their contracts with TLS, and also disclosed that he had consulted the matter with local attorneys. Docket No. 130-41. There is also evidence suggesting that Rodriguez largely copied the template of an operating agreement created by TLS when a new limited liability company was created. Docket No. 130-36. Moreover,

in June 2015, Rodriguez discussed with Brad Schumacher the contents of a contract that Rodriguez created while working at TLS. Docket No. 130-4 at 2. And, in July 2015, Rodriguez told Harris about two of TLS's contracts that were canceled and asked Harris to "keep this between us." Docket No. 130-32. With respect to the final category of information, TLS has shown that Rodriguez directed several TLS clients to Todd Mardis, a sales channel for TLS, as well as to Hebe Lugo, a service provider for TLS. Docket Nos. 130-2, 130-46. Rodriguez does not suggest that he was authorized to disclose any of the foregoing confidential information, and so TLS is likely to succeed on the merits.

Notwithstanding the above, defendants contend that TLS is not entitled to injunctive relief because there is no "evidence" or "arguments" relating to whether Rodriguez accessed or intercepted TLS's Dropbox without authorization. But while unlawful *interception* and unlawful *access* are the linchpins of the conduct prohibited by Titles I and II of the Electronic Communications Privacy Act, respectively, TLS has moved for injunctive relief under the Act—which specifically seeks to stop *misappropriation* of confidential information constituting a trade secret. *See, e.g.*, *United States v. Councilman*, 418 F.3d 67, 72, 81 (1st Cir. 2005) (en banc); P.R. Laws Ann. tit. 10, § 4134. And such misappropriation can occur even if a defendant did not intercept or access an electronic communication. *See, e.g.*, P.R. Laws Ann. tit. 10, § 4134. Indeed, unauthorized disclosure of another's trade secret "obtained under circumstances from which a duty to maintain confidentiality or to limit use ensues" is sufficient to establish "misappropriation." *Id.*

Rodriguez next suggests that he was permitted to use TLS's confidential information in advising clients who no longer wanted to use TLS's services. But TLS does not contend at this juncture that Rodriguez is prohibited from working as a certified public accountant. And TLS correctly underscores that because Rodriguez expressly agreed in the SCA and the NDA not to use TLS's confidential information, he may not use that confidential information to obtain a business advantage. Moreover, the uncontroverted evidence shows that, while Rodriguez was employed at TLS, he copied many documents

into a file named GOS—the company he began operating after leaving TLS. And because Rodriguez has also admitted that he and Ramos used a shared laptop to access TLS's Dropbox, there is a reasonable inference that Rodriguez (who spearheads GOS) and Ramos (who leads ASG) obtained TLS's confidential information. *See, e.g.*, *Bledsoe*, 147 F. Supp. 3d at 652 ("When files are uploaded to Dropbox by a user, they automatically 'sync' with another computer selected by the user, meaning that the files are transferred from one computer to another.").

In a last-ditch attempt to prevent the issuance of a preliminary injunction, defendants raise two red herrings and one additional meritless argument. First, Rodriguez suggests he kept some of TLS's confidential documents in case they were needed for a peer-review process instituted by others in his profession. Docket Nos. 145, 176. But even if this is true, a dubious proposition since Rodriguez now admits he was not subject to the peer review program, this contention does not do away with all the communications Rodriguez had with third parties in which he disclosed information that likely constitutes TLS's trade secrets. Docket No. 176 at 2. Second, Rodriguez claims that the court should not issue a preliminary injunction because he has reported to the IRS allegedly unlawful conduct by TLS. Docket No. 136 at 11–12. But the record evidence shows that Rodriguez has disclosed confidential information to parties other than the IRS in apparent attempts to gain a business advantage, and nowhere in TLS's briefing or proposed order does TLS claim that the court should prohibit defendants from participating in any proceeding before a government agency. Docket Nos. 130, 130-47, 134, 139-1, 145, 154, 175. In any event, the injunction that will issue should not be interpreted to prohibit any such participation.[3]

Finally, defendants contend TLS's motion is "moot" by suggesting Rodriguez no longer has any confidential documents. But even assuming *arguendo* that Rodriguez no

---

[3] In this vein, it is noteworthy that "allegations of purely private wrongdoing are not protected disclosures under" the Whistleblower Protection Act, as amended by the Whistleblower Protection Enhancement Act. *See Aviles v. Merit Sys. Prot. Bd.*, 799 F.3d 457, 466 (5th Cir. 2015).

longer has any of TLS's confidential documents in his possession, the likely circumstance that he can recall inside information gained at TLS remains. And to the extent defendants suggest that the case is moot because Rodriguez has voluntarily ceased the alleged tortious conduct, it is well-settled that a "defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000). Thus, TLS is likely to succeed in showing that defendants misappropriated TLS's trade secrets in violation of the Act.

### B.    Balancing of Hardships

The balance-of-hardships inquiry requires the court to balance "the hardship that will befall the nonmovant if the injunction issues . . . with the hardship that will befall the movant if the injunction does not issue." *See, e.g.*, *Mercado-Salinas v. Bart Enterprises Intern., Ltd.*, 671 F.3d 12, 19 (1st Cir. 2011). If an injunction does not issue, TLS will likely be harmed by defendants' continued use or dissemination of its trade secrets. This is a weighty circumstance because the "loss of a trade secret is generally found to constitute irreparable harm." *See TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 32 (D. Mass. 2004); *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) ("once the trade secret is lost, it is gone forever."). And while the Act does not require a showing of irreparable harm, I find, in any event, that TLS is likely to suffer irreparable harm from the loss of its trade secrets because it is one of the reasons that the balance of hardships tips in TLS's favor. *See Systema de P.R., Inc.*, 23 P.R. Offic. Trans. 347 (in context of request for injunctive relief under Puerto Rico Law 75, which also does not require a showing of irreparable harm, court held that "the statute does not bar the use of" the "tests" for awarding injunctive relief under traditional equitable principles).

Moreover, if an injunction does not issue, TLS would likely lose, at least temporarily, the benefit of the confidentiality provisions in the SCA and NDA. On the other hand, if an injunction issues, defendants will likely have to ensure that they are not using TLS's confidential information to operate their businesses, and this includes any of TLS's

TLS Management and Marketing Services LLC v. Rodriguez-Toledo, *et al.*, Civil No. 15-2121 (BJM)       11

confidential information maintained on defendants' websites. This may be costly for defendants. And defendants will also be required to return any confidential information, which may require them to expend time searching within their digital devices and elsewhere for any of TLS's documents. But because the injunction does not prevent Rodriguez, ASG, or GOS from continuing to do business, because Rodriguez agreed not to use TLS's confidential information in the first place, and because Rodriguez should not have copied TLS's confidential documents before leaving his employment with TLS, any costs defendants may be required to expend will be largely correlated with, and attributable to, the extent of their prior malfeasance. Thus, this factor tips in TLS's favor.

### C.    Public Interest

The final factor, the public interest, also weighs in favor of granting the injunction. "The public interest that is referred to in the test for a preliminary injunction means the public's interest in the *issuance of the injunction itself*." *Braintree Labs., Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 45 n.8 (1st Cir. 2010). When, as here, "the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009) (quoting *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003)).

In this case, the Act was enacted relatively recently (in 2011) to provide protections against misappropriation of trade secrets. P.R. Laws Ann. tit. 10, § 4131. Issuing an injunction under the circumstances of this case would thus further that purpose. And the issuance of the injunction would also further the public interest because it would reaffirm the importance of abiding by contractual obligations such as those contained in the SCA and NDA. *See, e.g.*, *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007) ("[I]ssuing the preliminary injunction would hold Defendants to the terms of the bargain they entered into through the franchise agreement.

TLS Management and Marketing Services LLC v. Rodriguez-Toledo, *et al.*, Civil No. 15-2121 (BJM)                    12

Enforcement of contractual duties is in the public interest."); *see also* P.R. Laws Ann. tit. 31, § 3471 ("If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed."). Thus, because TLS has met all the requirements for obtaining preliminary relief, a preliminary injunction shall issue.

## CONCLUSION

For the foregoing reasons, TLS's preliminary injunction motion is **GRANTED**.

## PRELIMINARY INJUNCTION ORDER

Ricky Rodriguez-Toledo, ASG Accounting Solutions Group, Inc., Global Outsourcing Services LLC, and their officers, servants, employees, attorneys, successors and assigns, and any person acting in concert or participation with them, are hereby enjoined from using or disclosing any of TLS's "confidential information," in violation of, and as defined by, the SCA and NDA. Docket No. 74-4 ¶¶ 5.2.–5.2.3; Docket No. 74-7 ¶¶ 1.2–1.2.4. "Confidential information" includes TLS's business methods, systems, and procedures; clients; agent lists; marketing channels and relationships; marketing methods; costs; prices; products; formulae; prospective and executed contracts; business arrangements; proposals; project plans; reports; implementation documents; and clients' personal and financial information. "Confidential information" also includes the identities of TLS's agents, contractors, consultants, sales representatives, sales associates, subsidiaries, strategic partners, licensors, and licensees. Defendants must locate and return to TLS all documents in their possession, if any, that contain TLS's confidential information. Defendants must also ensure that their businesses, including the webpages for those businesses, are not employing TLS's confidential information.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 30th day of March 2017.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge