**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**TLS MANAGEMENT AND MARKETING
SERVICES LLC**,
    Plaintiff,

v.

**RICKY RODRÍGUEZ-TOLEDO**, *et al.*,
    Defendants.

Civil No. 15–2121 (BJM)

## OPINION AND ORDER

TLS Management and Marketing Services LLC ("TLS") filed a complaint against, among others, Ricky Rodríguez-Toledo ("Rodríguez"), Lorraine Ramos ("Ramos"), Miguel Santo Domingo-Ortiz ("Santo Domingo"), ASG Accounting Solutions Group, Inc. ("ASG"), and Global Outsourcing Services LLC ("GOS"), alleging violations of Titles I and II of the Electronic Communications Privacy Act ("ECPA"); violations of the Puerto Rico Commercial and Industrial Trade Secret Protection Act, (the "Act"), P.R. Laws Ann. tit. 10 §§ 4131–4141; breach of contract, in violation of Articles 1044, 1054, 1077 and 1206 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 §§ 2994, 3018, 3052, 3371; conversion, in violation of Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141; and tortious interference with various contracts, in violation of Article 1802 of the Puerto Rico Civil Code. P.R. Laws Ann. tit. 31, § 5141. Docket No. 74. The claims arising under Title I of the Electronic Communications Privacy Act ("Wiretap Act") and the other state-law claims survived defendants' motion to dismiss. Docket No. 173. TLS moved for summary judgment on its claims against Rodriguez, Ramos, Santo Domingo, ASG, and GOS, Docket Nos. 297, 301, and Rodríguez, Ramos, ASG, and GOS (collectively "Defendants") opposed. Docket Nos. 308, 309.[1] Defendants moved for summary judgment only on TLS's state law claims, Docket Nos. 299, 300, 354, 355, and TLS opposed. Docket Nos. 340, 341. Defendants also sought reconsideration of a previous order denying summary judgment of TLS's claims under

---

[1] Santo Domingo did not oppose TLS's summary judgment motion and did not file his own motion for summary judgment.

the Wiretap Act, Docket No. 339, and TLS opposed. Docket No. 347. The case is before me on consent of the parties. Docket No. 93.

For the reasons set forth below, the motions for summary judgment are **GRANTED** in part and **DENIED** in part. The motion for reconsideration is **DENIED**.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo* v. *U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). Once that bar is cleared, "the burden shifts to the summary judgment target to demonstrate that a trialworthy issue exists," *Plumley v. S. Container, Inc.*, 303 F.3d 364, 368 (1st Cir. 2002), by "affirmatively point[ing] to specific facts" in the record revealing the presence of a meaningful dispute, *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg* v. *P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan* v. *Smith*, 904 F.2d 112, 115 (1st Cir. 1990). And the court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## BACKGROUND[2]

As a threshold matter, TLS sought to exclude a number of Defendants' statements of uncontested fact because they were based on affidavits. TLS argued that Rodríguez's affidavit was impermissible evidence as it was conclusory and self-serving and argued that the affidavits of Bob Renguso, Brad Schumacher, and Jay Harris were inadmissible as hearsay. PRSUF ¶¶ 30, 172, 173. "Courts and parties have great flexibility with regard to evidence that may be used on a Rule 56 proceeding, and as Rule 56(c) makes clear, in deciding summary judgment motions courts may consider any material that would be admissible or usable at trial[.]" *Asociacion De Periodistas De Puerto Rico v. Mueller*, 680 F.3d 70, 78 (1st Cir. 2012). "A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment." *Cadle Co. v. Hayes*, 116 F.3d 957, 961 (1st Cir. 1997). Furthermore, "at summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016). There is nothing to suggest that Rodríguez and the non-parties' testimony would not be admissible at trial, so there is no need to exclude Defendants' affidavits.

TLS is a Puerto Rico-based tax planning and consulting firm. PSUF ¶¶ 1-2. ASG is a boutique firm organized in 2007 by Rodríguez; it also performs tax planning and consulting among

---

[2] Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56 submissions: TLS's Statement of Uncontested Facts ("PSUF"), Docket No. 301; the Defendants' Opposing Statement of Facts ("DSUF"), Docket No. 299, Defendants' reply to TLS's PSUF ("DRSUF"), Docket No. 308, and TLS's reply to Defendants' DSUF ("PRSUF"), Docket No. 341. Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record, that the movant contends are uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. *Id.* 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). While the "district court may forgive a party's violation of a local rule," litigants ignore the Local Rule "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

other services. DSUF ¶ 12. Ramos, Rodríguez's wife, is an accountant and a subcontractor for ASG. PSUF ¶ 12; DSUF ¶ 16. ASG, through Rodríguez as its only principal, began to work as a Subcontractor for TLS in 2012. PSUF ¶¶ 4, 15; DSUF ¶ 13. At that time, ASG signed a Subcontractor Agreement (the "SCA") that included a confidentiality clause and a non-compete clause. PSUF ¶ 15. Rodríguez later became TLS's Managing Director until he resigned in January 2015. PSUF ¶¶ 4, 21. When Rodríguez began working for TLS as its Managing Director, Rodríguez signed a Confidentiality and Non-Disclosure Agreement (the "NDA") that included a confidentiality clause. PSUF ¶ 19.

Santo Domingo was a subcontractor for TLS; when he began with TLS, he signed a Confidentiality and Non-Disclosure Agreement that included a confidentiality clause. DSUF ¶¶ 25-26. At the end of 2013, Santo Domingo ceased working for TLS, and in 2014, Santo Domingo incorporated GOS. PSUF ¶ 28, DSUF ¶ 32. After Rodríguez resigned from TLS, he took over a 70% share of GOS. DSUF ¶ 40. By early 2017, Santo Domingo had left GOS, and Rodríguez was the sole owner. DSUF ¶ 41.

Before leaving TLS, Rodríguez copied all of the documents from his TLS Dropbox account to a flash drive. PSUF ¶ 74; DSUF ¶ 69. ASG also kept the files that it worked on for TLS. PSUF ¶¶ 76–77. DRSUF ¶¶ 76–77. ASG kept the documents as part of its document retention policy and because they "add[ed] value to its clients." PSUF ¶ 76; Docket No. 301–11 at 2.

In its business, TLS used loan programs and loan applications. PSUF ¶¶ 89, 91. It employed a U.S. Possession Strategy for which it used a buy-sell agreement. PSUF ¶¶ 79, 87. TLS also had an operating agreement in its possession. PSUF ¶ 94. GOS later used a loan program similar to TLS's loan program. DRSUF ¶ 90. Rodríguez modified one of TLS's loan applications for the loan program. DRSUF ¶ 91. ASG and GOS also used buy-sell agreements with their clients as using them is a "best practice" in the industry. PSUF ¶ 88; DRSUF ¶¶ 87-88. ASG used the operating agreement that TLS had for a third company. PSUF ¶ 93; DRSUF ¶ 93.

ASG, GOS, and Rodríguez had not worked on a U.S. Possession Strategy before Rodríguez worked at TLS. PSUF ¶ 78; DRSUF ¶ 78. While at TLS, Rodríguez worked on its U.S. Possession

Strategy, recommending modifications to the program that TLS then implemented. PSUF ¶ 79; DRSUF ¶ 79. As an employee at TLS, Rodríguez would explain "'every single detail [of] how the [U.S. Possession strategy] . . . worked' to TLS's clients. This included '[h]ow the structure works, how the documents that they [the clients] signed worked, what did they mean, what was our [TLS's] process into working with them.'" PSUF ¶ 81 (quoting Rodríguez's deposition)); DRSUF ¶ 81. After leaving TLS, Rodríguez stated that he and ASG used the U.S. Possession Strategy with clients. PSUF ¶ 84; DRSUF ¶ 84; Docket No. 301-1 at 100-01.

After leaving TLS, Rodríguez, ASG, and GOS worked with several of TLS's associates and clients. ASG worked with Brad Schumacher, Bob Renguso, and Jay Harris, all clients who had contractual relationships with TLS, as they sought to leave TLS. PSUF ¶¶ 135–138; DSUF ¶¶ 174–78. During the course of that working relationship, ASG discussed TLS's strategies and services with them. DSUF ¶ 177. Rodríguez, ASG, and GOS also interacted with TLS clients, Elgin Allen, Lawrence Friedman, Doug Clancy, and Ora Goldman, and TLS associates, Todd Mardis, Frank DeVincent, David Pulling, Cliff Morgan, Todd Thomae, Tim Kissling, and Walt Dallas. PSUF ¶¶ 143–75. While working with their clients, Rodríguez, ASG, and GOS discussed TLS methods, strategies, and practices although the source of the information discussed is contested. PSUF ¶¶ 98–142; DRSUF ¶¶ 98–142.

## DISCUSSION

### A. *Federal Law Claim*

Defendants previously submitted a motion for summary judgment seeking to dismiss both of TLS's federal law claims. *See* Docket No. 188. I denied summary judgment on TLS's claim under the Wiretap Act. Defendants then sought reconsideration of that order based on four alleged errors by the court: 1. Refusing to consider Defendants' additional facts submitted in their sur-reply; 2. Allowing TLS to "modify its theories, but preclud[ing] Defendants from addressing them; 3. Adopting incorrect facts; and 4. Misinterpreting *United States v. Szymuszkiewicz*, 622 F.3d 701 (7th Cir. 2010). *See* Docket No. 339. "The granting of a motion for reconsideration is an extraordinary remedy which should be used sparingly. . . . To obtain relief, the movant must

demonstrate either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law." *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006) (internal citations and quotations omitted). Notably, merely regurgitating past arguments is not sufficient to merit reconsideration. *See id.* (denying motion for reconsideration where "plaintiff's motion for reconsideration did no more than reiterate the arguments she earlier had advanced").

Here, Defendants' motion for reconsideration may be disposed of quickly. Their first ground for reconsideration is based on the false premise that either TLS's submission of its response to Defendants' motion for summary judgment or to my order granting an adverse inference due to Defendants' spoliation of evidence caused a shift in the burden of proof from TLS to Defendants. As Defendants have cited no law showing that either event can create a shift in the burden of proof, Defendants have not demonstrated that the court committed a manifest error of law. On their second ground for reconsideration, Defendants merely state that the court did not properly merit the argument that they made in previous filings. However, the First Circuit has clearly stated that reiterating past arguments does not create a ground for reconsideration. See *Palmer*, 465 F.3d at 30. Defendants' third ground for reconsideration is that they disagree with the court's interpretation of the facts, but this is once again a far cry from showing that there was a "manifest error of law." Finally, Defendants argue that the court misapplied *United States v. Szymuszkiewicz* but provided no case law to rebut the court's interpretation. As Defendants' motion for reconsideration fails to show either a manifest error of law or put forward newly discovered evidence, it is **DENIED**.

TLS now seeks summary judgment, arguing that it has shown that there is no genuine dispute of material fact that Defendants violated the Wiretap Act. *See* Docket No. 297 at 14. The ECPA amended the Federal Wiretap Act, 18 U.S.C. §§ 2510–2522, "by extending to data and electronic transmissions the same protection already afforded to oral and wire communications." *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003). Because the "1968 Wiretap Act [w]as amended by Title I of the ECPA," Title I of the ECPA is also known as the Wiretap Act. *See*

*Councilman*, 418 F.3d at 81 n.15; *In re Pharmatrak, Inc.*, 329 F.3d at 18. "The post-ECPA Wiretap Act provides a private right of action against one who 'intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication.'" *In re Pharmatrak, Inc.*, 329 F.3d at 18 (quoting 18 U.S.C. § 2511(1)(a), and citing 18 U.S.C. § 2520 (provides a private right of action)).

To state a claim "under Title I of the ECPA," the plaintiff's complaint must allege "that a defendant (1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication (5) using a device." *See In re Pharmatrak, Inc.*, 329 F.3d at 18. *Intercept* is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). And, like a claim arising under the SCA, a claim under the Wiretap Act "is subject to certain statutory exceptions, such as consent." *See In re Pharmatrak, Inc.*, 329 F.3d at 18; *see also United States v. Smith*, 155 F.3d 1051, 1055 (9th Cir. 1998) ("[T]he intersection of the Wiretap Act . . . and the Stored Communications Act . . . is a complex, often convoluted, area of the law[.]").

Defendants' only argument against TLS's motion on for summary judgment on its claim under the Wiretap Act is that the court somehow terminated all parties' ability to discuss the Wiretap Act. *See* Docket No. 309 at 19. After Defendants filed their original motion for summary judgment on TLS's federal law claims at Docket No. 188, the parties both made several subsequent filings related to the motion. At Docket No. 272, I entered an order granting TLS's motion for leave to file a Surreply and also stating, "Defendants' 188 motion for summary judgment is now submitted, and no further filings on this matter will be allowed." Defendants now seek to misinterpret my order ending the filings on *their* original motion for summary judgment as a reason for the court to strike TLS's current motion for summary judgment on the Wiretap Act its corresponding statements of uncontested material fact. *See* Docket No. 308 at 40 ("[Statements 176–207 refer to the Wiretap Act which the court specifically ruled was a 'submitted' subject matter-Dkt. 272. As such, these statements should be stricken.]"). I decline Defendants' invitation

to interpret my order ending filings on Defendants' motion for summary judgment at Docket No. 188 as creating a moratorium on discussion of the Wiretap Act. Moreover, as Defendants both asked for an opportunity address the Wiretap Act (in case their interpretation of the order was incorrect) and then went on to address TLS's claims under the Wiretap Act, I similarly decline their request for an order allowing Defendants to make a belated filing addressing the matter. *See* Docket No. 309 at 20–21.

TLS concedes that it cannot prove that Defendants "engaged in the contemporaneous interception of its electronic communications," a required element in proving a violation of the Wiretap Act, without an adverse inference that Defendants did so. Docket No. 297 at 18 ("Considering Defendants' spoliation, TLS cannot show they engaged in the contemporaneous interception of its electronic communications."). Consequently, TLS argues that the court should make an adverse inference that "an inspection of the Laptop would have revealed that Defendants contemporaneously intercepted TLS electronic communications, and so hold that Defendants violated the Wiretap Act." *Id*. However, TLS's understanding of the court's role after issuing an adverse inference sanction is flawed. With an adverse inference sanction, the "trier of fact may (*but need not*) infer from a party's obliteration of a document relevant to a litigated issue that the contents of the document were unfavorable to that party." *Booker v. Massachusetts Dep't of Pub. Health*, 612 F.3d 34, 45 (1st Cir. 2010) (quoting *Testa v. Wal–Mart Stores, Inc.*, 144 F.3d 173, 177 (1st Cir. 1998)) (emphasis added); *see also Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 217 (1st Cir. 1982) ("When the contents of a document are relevant to an issue in a case, *the trier of fact generally may* receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so . . . [because] the contents would harm him.") (emphasis added). Therefore, whether or not to accept an adverse inference is the provenance of the fact-finder; such a decision cannot be made by the court on summary judgment. As it is a genuine dispute of material fact as to whether the fact-finder will choose to infer that "an inspection of the Laptop would have revealed that Defendants

contemporaneously intercepted TLS electronic communications," summary judgment on TLS's Wiretap Act claim is **DENIED**.

### B. The Act

TLS next alleges that Defendants violated the Act by misappropriating its trade secrets. Docket No. 297 at 8. As the court previously granted a preliminary injunction based on Defendants' alleged use of TLS's trade secrets, TLS now seeks summary judgment on its claim and a permanent injunction. *Id*. The Act provides that "[i]n all cases in which it is proven that an industrial or trade secret has been misappropriated, the court may issue a preliminary injunction order, for which the plaintiff shall not be under the obligation to prove irreparable damages. Furthermore, the court may issue a permanent injunction once the case has been fully heard." P.R. Laws Ann. tit. 10, § 4136. Where a state law provides for injunctive relief and that relief is "not tied to a showing of irreparable injury," the court need not make findings as to that part of the test for injunctive relief. *See Waterproofing Sys., Inc. v. Hydro-Stop, Inc.*, 440 F.3d 24, 33 (1st Cir. 2006); *Pearl Investments, LLC v. Standard I/O, Inc.*, 297 F. Supp. 2d 335, 337 (D. Me. 2004) ("When state law defines the underlying substantive right, state law also governs the availability of such equitable remedies as a permanent injunction"); *Systema de P.R., Inc. v. Interface Int'l*, 23 P.R. Offic. Trans. 347 (P.R. 1989) (in the context of a request for preliminary injunctive relief pursuant to Puerto Rico Law 75, P.R. Laws Ann. tit. 10, §§ 278–278d, which also does not require a showing of irreparable harm, "courts should apply the equity tests established in the classical injunction case law, tempered for purposes of Act No. 75.").

TLS contends that injunctive relief should be awarded because defendants have used or divulged confidential information that can be divided into four categories: TLS's (1) methods, systems, and procedures; (2) costs, prices, and formulas; (3) prospective and executed contracts and other business arrangements; and (4) agents, contractors, and partners. Docket No. 297 at 8. The Act provides that "[a]ny natural or juridical person who misappropriates a trade secret shall be held accountable for any damages caused to its owner." P.R. Laws Ann. tit. 10, § 4134. An "industrial or trade secret" is defined as "any information . . . [t]hat has a present or a potential

independent financial value or that provides a business advantage, insofar as such information is not common knowledge or readily accessible through proper means by persons who could make a monetary profit from the use or disclosure of such information, and . . . for which reasonable security measures have been taken, as circumstances dictate, to maintain its confidentiality." *Id*. §§ 4132(a)–(b). The Act defines "information" as "[k]nowledge that broadens or clarifies knowledge already garnered. It includes, but is not limited to, any formula, compilation, method, technique, process, recipe, design, treatment, model or pattern." *Id*. § 4131(a).

   "Measures that can be deemed to be reasonable to maintain the confidentiality of the trade secret include," *inter alia*, "requiring company employees authorized to access such information to sign confidentiality agreements," "establishing control measures for the use of or access to such information by company employees," or "implementing any technologically available measures when publishing or transmitting such information over the Internet, including the use of email, web pages, message boards, and any other equivalent medium." *Id*. §§ 4133(c), (g), (h). And "misappropriation" includes, among other things, "the disclosure or use of a trade secret belonging to another without his/her express or implicit consent, by a person who . . . at the time of disclosure or use . . . knew or should have known that such trade secret was . . . obtained under circumstances from which a duty to maintain confidentiality or to limit use ensues." *Id*. § 4134(b)(2)(B).

   Defendants question whether much of what TLS labels as its trade secrets qualify as such because they allegedly do not have a "present or a potential independent financial value" and do not provide TLS with a "business advantage, insofar as such information is not common knowledge or readily accessible through proper means by persons who could make a monetary profit from the use or disclosure of such information." *Id*. §§ 4132(a)–(b); *see* Docket No. 309 at 10; Docket No. 300 at 32. TLS identified multiple groups of trade secretes that Defendants misappropriated.

   First, TLS claims that Defendants disclosed its "confidential methods and procedures related to lending, collateral, and insurance" as well as its "financial procedures, tax and insurance strategies" and its "methods and procedures related to a TLS program" (all of which, according to

TLS, are its trade secrets) to TLS's clients. Docket No. 297 at 9. TLS has successfully argued that these fall within the definition of Confidential Information that is in its contracts with ASG and Rodríguez. *Id*. at 9–10. Moreover, because Rodríguez, ASG, and GOS were seeking to use this information in their own business, it can be inferred that the information provided a "business advantage." It is less clear, though, the information was not "readily accessible through proper means by persons who could make a monetary profit from the use or disclosure of such information" because TLS has not established that there is no genuine dispute as to whether its methods and procedures were different than the methods and procedures of other similar businesses. TLS argues that its information is proprietary as exemplified by its use of confidentiality agreements, but Rodríguez explained that its strategies and programs are the same as "other companies in Puerto Rico" and even "world-wide." Docket No. 300 at 34. In addition, there is also a dispute regarding misappropriation as the evidence that TLS proffered of Rodríguez divulging TLS's methods and strategies to clients is inconclusive: it is not clear what the source of Rodríguez's information was when he spoke with clients. It could have been TLS's trade secrets or Rodríguez's own industry knowledge and information that the clients provided him. PSUF ¶¶ 98–116.[3] As TLS has not proven that Rodríguez, ASG, and GOS could not discuss TLS's trade secrets with third parties when the third parties are the ones who proffered the information, there is a genuine dispute of material fact as to whether TLS's methods, procedures, and systems qualify as trade secrets under protection of the Act and whether, even if they do, there was any misappropriation.

TLS next argues that Defendants misappropriated its trade secrets by disclosing its "costs, prices, products, formulas and compositions" and its "prospective and executed contracts, other business arrangements and project plans." Docket No. 297 at 11–12. Even assuming without deciding that such information qualifies as TLS's trade secrets, Defendants have created a genuine

---

[3] Moreover, the two email exchanges that could most conclusively prove TLS's argument are also inconclusive because Defendants' comments are noted as being in-line edits of a different color, but the exhibit is black and white with no indication as to who wrote what. See Docket Nos. 301-47, 301-48.

dispute of material fact as to whether Rodríguez, ASG, and GOS actually misappropriated that information. Specifically, TLS argues that Rodríguez, ASG, and GOS provided the above information to its clients, and Defendants argue that the clients provided that information to Rodríguez, ASG, and GOS. PSUF ¶¶ 103, 105, 117–42, DRSUF ¶¶ 103, 105, 117–42. As TLS did not prove that Rodríguez, ASG, and GOS could not discuss TLS's trade secrets with third parties when the third parties are the ones who proffered the information, summary judgment is inappropriate.

Finally, TLS argues that Rodríguez, ASG, and GOS revealed the names of two of TLS's business associates to third-parties. *See* Docket No. 297 at 12–13. However, TLS failed to satisfactorily allege that this constituted a violation of TLS's trade secrets. With regard to the first business associate, TLS's evidence that Rodríguez, ASG, and GOS revealed the identity of Todd Mardis to third-parties is insufficient because, as I explained above in footnote 2, it is not clear in the relevant email which of the multiple authors wrote what information. *See* PSUF ¶ 131; Docket No. 301–47. With regard to the second associate, it is even less clear whether Rodríguez disclosed any of TLS's trade secrets. In the email where Rodríguez recommended that Bob Renguso reach out to "Hebe," a business associate of TLS, Rodríguez did not disclose any connection between Hebe and TLS. PSUF ¶ 132; Docket No. 301–74. TLS does not attempt to argue that the mere mention of a person, without any connection drawn between that person and TLS, violates the Act. Consequently, summary judgment on TLS's claims for violation of the Act is **DENIED** for both TLS and Defendants as genuine disputes of material fact remain.

### C. *Breach of Contract*

TLS argues that Rodríguez, ASG, and Santo Domingo breached the confidentiality clauses in the three separate employment contracts that each signed with TLS. Docket No. 297 at 4. It is uncontested that TLS and ASG signed the SCA, which includes a confidentiality clause; that TLS and Rodríguez signed the NDA, which includes a very similar confidentiality clause to the SCA; and that TLS and Santo Domingo signed a confidentiality and non-disclosure agreement, which also includes a very similar confidentiality clause to the SCA. PSUF ¶¶ 15, 18, 19, 25.

Under Puerto Rico law, the elements of a cause of action for breach of contract are (1) a valid contract, and (2) a breach by one of the parties to the contract. *Torres v. Bella Vista Hosp., Inc.*, 523 F. Supp. 2d 123, 152 (D.P.R. 2007) (citing *F.C. Imports, Inc. v. First Nat'l Bank of Boston*, 816 F. Supp. 78, 93 (D.P.R. 1993); *Unisys P.R., Inc. v. Ramallo Brothers Pringing, Inc.*, 91 J.T.S. 69, 128 D.P.R. 842 (P.R. 1991)). For a contract to be valid, there must be (1) the consent of the contracting parties, (2) a definite object which may be the subject of the contract, and (3) the cause or consideration.  31 L.P.R.A. § 3391.

Here, the parties do not dispute the validity of the three contracts. PSUF ¶¶ 15, 18, 19, 25. However, Defendants seek summary judgment on TLS's breach of contract claims because they argue that the confidentiality clauses are so ambiguous as to be void. *See* Docket No. 300 at 10. They seek to introduce extrinsic evidence to prove that the clauses are ambiguous and that TLS allowed Rodríguez to interpret them as he wished. *See id*. Furthermore, they argue that the language of the confidentiality clause makes it in effect a non-compete clause, which must be struck along with the non-compete clause in the SCA because of their failure to meet the requirements for such clauses under Puerto Rico law. *See id*. at 3–8

"Article 1233 determines the manner in which courts should interpret contracts under dispute as to the meaning of their terms. The Article is strict in its mandate that courts should enforce the literal sense of a written contract, unless the words are somehow contrary to the intent of the parties." *Hopgood v. Merrill Lynch*, 839 F. Supp. 98, 104 (D.P.R. 1993). "If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." P.R. Laws Ann. tit. 31, § 3471; *IOM Corp. v. Brown-Forman Corp.*, 553 F. Supp. 2d 58, 63 (D.P.R. 2007). "An agreement is clear when it can 'be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation.'" *In re Advanced Cellular Sys., Inc.*, 483 F.3d 7, 12 (1st Cir. 2007) (quoting *Catullo v. Metzner*, 834 F.2d 1075, 1079 (1st Cir. 1987)). When interpreting a contract with "several sections or clauses, they should be interpreted in relation to one another, giving to those that are doubtful the meaning which may appear from the consideration of all of them together." *Autoridad*

*de Carreteras y Transportacion v. TransCore Atl., Inc.*, No. CV 15–1924 (FAB), 2017 WL 1049574, at *3 (D.P.R. Mar. 20, 2017) (internal quotations omitted) (citing *P.R. Elec. Power Auth. v. Philipps*, 645 F. Supp. 770, 772 (D.P.R. 1986) (Fuste, J.) ("[T]he terms of the contract must be read together and harmonized to arrive at the intention of the parties.")). If a contract is ambiguous, then, and only then, may the court consider extrinsic evidence to ascertain the intent of the parties when they signed the contract. *See Pina v. Rivera*, No. CV 11–2217 (GAG/BJM), 2015 WL 13216418, at *4 (D.P.R. Dec. 18, 2015), report and recommendation adopted, No. CV 11–2217 (GAG), 2016 WL 868190 (D.P.R. Mar. 7, 2016) ("[T]o consider the extrinsic evidence at all, the court must first find the relevant terms of the agreement unclear." (quoting *Executive Leasing Corp. v. Banco Popular de P.R.*, 48 F.3d 66, 69 (1st Cir. 1995)); *cf. In re Advanced Cellular Sys., Inc.*, 483 F.3d at 12 ("[A] court may not consider extrinsic evidence at all, if it finds that the terms of an agreement are clear.").

The confidentiality clause in the SCA states,

5. Confidentiality

5.1. Except as authorized in writing by TLS, neither Subcontractor nor any entity controlling, controlled by or under common control with Subcontractor (collectively, "Subcontractor Affiliates") will at any time directly or indirectly, disclose or utilize in any manner including for Subcontractor's own pecuniary gain, Confidential Information of TLS. Subcontractor may only use Confidential Information of TLS for a purpose that is necessary in carrying out the provisions of this Agreement.

5.2. "TLS Confidential Information" shall include, without limitation, all of the following, which shall be treated as Confidential Information of TLS by Subcontractor:

5.2.1. All information, whether written or otherwise and whether or not it is marked "confidential", "proprietary", or "copyright" at the time of disclosure, regarding TLS' business methods and procedures, clients or prospective clients ("TLS Clients"), agent lists, marketing channels and relationships, marketing methods, costs, prices, products, formulae, compositions, methods, systems, procedures, prospective and executed contracts and other business arrangements, proposals and project plans, and TLS Affiliates;

5.2.2. TLS reports and any information contained therein, related work products including implementation documents, and any other information provided to Client

by TLS or TLS Affiliates by or in connection with proposing or delivering TLS Services (individually or collectively, "TLS Plans");

5.2.3. The identities of agents, contractors. consultants, sales representatives, sales associates, subsidiaries, strategic partners, licensors, licensees, TLS Clients, suppliers, or other TLS service providers or sources of supply (collectively, "TLS Affiliates");

5.3. TLS Confidential Information shall not include (a) information disclosed with the prior written consent of TLS, (b) information that has been previously disclosed by TLS to the general public, (c) information that is required to be disclosed pursuant to a valid judicial court order, but only to the extent of and for the purpose of such order, and only if after receiving such an order Subcontractor provides timely notice of such order to TLS and cooperates reasonably with TLS' efforts to contest or limit the scope of such order, or (d) any strategy or methodology contained in the TLS Plan that is currently being utilized by Subcontractor or any of Subcontractor's other clients as a result of Subcontractor's prior recommendations (the "Excluded Strategies").

DSUF ¶ 101; *see* Docket No. 301–15 at 2–3. The confidentiality clause in the NDA precludes disclosing (but not utilizing) the Confidential Information, contains the same information as above, and also includes one further paragraph:

1.2.4. ("TLS") Executives, Partners or Management Personal Confidential Information contained therein, documents and/or financial information, and any other information that ("Recipient") may obtain knowledge during his/her tenure while working at ("TLS").

DSUF ¶ 112.

Defendants argue that the confidentiality clauses are ambiguous because the definitions are qualified as being "without limitation" to the terms listed, they are "a compilation of abstract words subject to each person's interpretation," and they are "as broad and infinite as the universe."[4] *See* Docket No. 300 at 10, 14. Defendants provide no case law or citations to support their arguments. Defendants' argument that that the term "without limitation" makes the clause ambiguous does not comport with this court's past decisions addressing contract interpretation. *See Puerto Rico Tourism Co. v. Priceline.com, Inc.*, No. CV 14–01318 (JAF), 2015 WL 5098488, at *5 (D.P.R.

---

[4] Defendants also make a number of arguments based on extrinsic evidence, but, as stated above, Puerto Rico law precludes the use of extrinsic evidence before a contract clause is deemed ambiguous. See Docket No. 300 at 9-14.

Aug. 31, 2015) (court found a statute was unambiguous even though the definitions included lists of terms "without limitation"); *Cellu-Beep, Inc. v. Telecorp, Inc.*, 322 F. Supp. 2d 122, 124 (D.P.R. 2004) (arbitration clause including description of terms that were "without limitation" was "pretty explicit and its language plainly obvious"). Furthermore, the clauses, when "interpreted in relation to one another," are in fact clear. *Autoridad de Carreteras y Transportacion*, No. CV 15–1924 (FAB), at *3. Although it is indisputable that the confidentiality clause is broad, that does not render it automatically ambiguous; rather, it is clear the intention of the parties was to expansively define Confidential Information as TLS's methods, procedures, and the tools it uses to practice those methods and procedures while simultaneously carving out from the definition any methods and procedures that the Subcontractor was already using—and thus could not be understood as having been learned from TLS even if TLS operated in the same fashion. DSUF ¶ 101. Similarly, the added language in the NDA reinforces that information that the Subcontractor/Recipient learns while at TLS is the Confidential Information of TLS. As the contract language is clear on its face, the court cannot use extrinsic evidence to interpret the intentions of the parties when signing the contracts.

Defendants also argue that the non-compete clause in the SCA does not comport with Puerto Rico law and thus must be struck. *See* Docket No. 300 at 3–8. The Puerto Rico Supreme Court in *Arthur Young & Co. v. Vega III*, No. RE-91-508, 1994 WL 909262 (P.R. May 24, 1994) held that all noncompetition agreements must, among other requirements, "specify the geographic limits or the clients involved." If the agreement has a geographic limit, the "area covered by the restriction must be strictly limited to that necessary to prevent an actual competition between employer and employee." *Id*. If the agreement instead specifies the clients to which it applies, then it must "refer only to those personally serviced by the employee during a reasonable period." *Id*. Here, Defendants argue that the non-compete clause in the SCA has neither a geographic limit nor a limit on the clients covered. *See* Docket No. 300 at 4–5. Not only did TLS fail to contest this argument in its response, but it is also clear from the contract language that neither limitation exist. *See* DSUF ¶ 98. Therefore, the non-compete clause in the SCA must be struck.

On the same grounds, Defendants argue that the confidentiality clause must also be struck because the fact that it prohibits the Subcontractor from "utiliz[ing]" as well as disclosing TLS's Confidential Information turns it into a non-compete clause. Docket No. 300 at 8; *see* DSUF ¶ 101. However, that is where Defendants' argument begins and ends. Defendants cite no law to explain how a prohibition on the use of TLS's Confidential Information is also a prohibition on competition nor do they provide their own reasons. *See* Docket No. 300 at 8. As this argument is not developed, Defendants have waived the argument for purposes of summary judgment under well-established First Circuit precedent that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

Having concluded that the confidentiality clause is both clear and valid, I turn to TLS's motion for summary judgment on its breach of contract claim. TLS argues that Rodríguez and ASG, and GOS[5] violated the confidentiality clauses by using similar buy-sell agreements and loan programs to those of TLS, modifying and using TLS's loan application and operating agreement, and using its U.S. Possession Strategy. Docket No. 297 at 6–7. TLS also argues that Rodríguez and ASG kept a copy of TLS's documents in violation of the confidentiality clause's requirement that Confidential Information be returned at the end of their employment, and then shared those documents with GOS. *Id*.

TLS's arguments for summary judgment based on Rodríguez, GOS, and ASG's use of a loan program and buy-sell agreements that are "similar" to TLS's may be quickly disposed of. The confidentiality clause clearly prohibits the use of TLS's methods and procedures, but it is not so broad that it prohibits the use of all methods and procedures that bear some resemblance to TLS's

---

[5] TLS argues that GOS is "barred from disclosing TLS's Confidential Information because Rodríguez is its Managing Director and Santo Domingo was its founder." Docket No. 297 at 4. As Defendants did not contest this in their response, I accept for the purposes of summary judgment that GOS is also bound by the confidentiality clauses.

practices. Without more, TLS cannot prove that there is no genuine dispute of material fact as to whether the loan programs and buy-sell agreements are sufficiently similar to TLS's that they fall under the protection of the confidentiality clause. *See* Docket No. 309 at 9 (Defendants argue that its loan program is no more similar to TLS's than it is to "many U.S. companies who wish to take their P.R. income to the mainland."), at 10 ("The use of buy-sell agreements takes place very often[.]"); PSUF ¶¶ 45, 87–90; DRSUF ¶¶ 45, 87–90.

It is similarly easy to grant TLS summary judgment on its claim that ASG, GOS, and Rodríguez breached the confidentiality clauses in the contract by taking and using TLS's loan agreement and operating agreement.[6] It is uncontested that Rodríguez took TLS's loan application, modified it, and used it as a loan application for GOS's business, and it is uncontested that ASG used an operating agreement that TLS had and then gave it to another company to use. DRSUF ¶¶ 91, 93. The confidentiality clause clearly prohibits the disclosure of TLS's products, formulae, compositions, methods, prospective contracts, and "any implementation documents . . . provided to Client by TLS or TLS Affiliates by or in connection with proposing or delivering TLS Services. *See* DSUF ¶ 101. The loan agreement and operating agreement, whether filled out or mere templates as Defendants argue, clearly fall into at least the categories listed above if not more. Defendants' argument that many businesses use loan agreements and operating agreements and that TLS's loan agreements and operating agreements were not unique are beside the point; the contract clearly stated that those documents were confidential and could not be disclosed and yet ASG, GOS, and Rodríguez both disclosed and utilized them to their benefit.

TLS also seeks summary judgment on its claim that ASG, GOS, and Rodríguez's use of its U.S. Possession Strategy violated the employment contracts. It is uncontested that ASG, GOS, and Rodríguez had not worked on the U.S. Possession Strategy before Rodríguez worked at TLS. PSUF ¶ 78; DRSUF ¶ 78. It is similarly uncontested that Rodríguez worked on the U.S. Possession

---

[6] Defendants pointed out in their response that Rodríguez admitted to taking a total of five documents from TLS, but TLS only argued that the taking of two of them—the loan agreement and the operating agreement—constituted a breach of contract. Docket No. 309 at 5 n. 2.

Strategy while at TLS, recommending modifications to the program that TLS then implemented. PSUF ¶ 79; DRSUF ¶ 79. As an employee at TLS, Rodríguez would explain "'every single detail [of] how the [U.S. Possession strategy] . . . worked' to TLS's clients. This included '[h]ow the structure works, how the documents that they [the clients] signed worked, what did they mean, what was our [TLS's] process into working with them.'" PSUF ¶ 81 (quoting Rodríguez's deposition)); DRSUF ¶ 81. After leaving TLS, Rodríguez stated that he and ASG used the U.S. Possession Strategy. DRSUF ¶ 84.

The confidentiality clause explicitly prohibits the disclosure and utilization of TLS's "methods" and "products" as well as "any implementation documents . . . provided to Client by TLS or TLS Affiliates by or in connection with proposing or delivering TLS Services" when the parties were not already using those methods in their own business. *See* DSUF ¶ 101. It is clear from Rodríguez's explanation that the U.S. Possession Strategy was a distinct strategy with multiple parts and thus would qualify as TLS's product (and therefore as TLS's Confidential Information). As it is uncontested that Rodríguez and ASG had not used the U.S. Possession Strategy before working at TLS, that Rodríguez learned how to use the U.S. Possession Strategy while at TLS, and that he implemented it while working at ASG after leaving TLS, it is clear that Rodríguez and ASG violated the confidentiality clauses of the SCA and NDA by both using the U.S. Possession Strategy and, through using it, disclosing it to the clients for whom they were working. *See* Docket No. 301–1 at 100 (Rodríguez explained that he has used "the process and structure that [he] had described [the U.S. Possession Strategy]" with clients). Defendants' argument that other companies have similar programs is unavailing; the question is not whether TLS's strategy is unique but whether ASG and Rodríguez used TLS's strategy in violation of the SCA and NDA.

Defendants contest that GOS used the U.S. Possession Strategy, and the evidence presented by TLS—Rodríguez's deposition statements—only shows that Rodríguez and ASG used the U.S. Possession Strategy. *See* DRSUF ¶ 84. Therefore, summary judgment must be granted to TLS as

to its claim against Rodríguez and ASG for their use of the U.S. Possession Strategy in violation of their contracts and granted to Defendants for TLS's claim against GOS for the same actions.

TLS's final claim for breach of contract is that ASG, GOS, and Rodríguez kept its files after their employment with TLS ended. *See* Docket No. 297 at 6. TLS argues and Defendants agree that the SCA "obligates ASG and Rodríguez to return and deliver to TLS any Confidential Information in their possession upon its termination." PSUF ¶ 34; DRSUF ¶ 34.[7] Furthermore, Defendants agree that after Rodríguez and ASG's employment with TLS ended, both kept TLS's files. PSUF ¶¶ 74, 76–77. DRSUF ¶¶ 74, 76–77. Rodríguez kept a copy of all of TLS's files that were in Dropbox, which indisputably included Confidential Information as defined by the SCA, and ASG kept copies of all the work that it did for TLS, which similarly indisputably included Confidential Information as defined by the SCA. PSUF ¶¶ 74, 76; DRSUF ¶¶ 74, 76. ASG kept the documents as part of its document retention policy and because they "add[ed] value to its clients." PSUF ¶ 76; Docket No. 301–11 at 2.

Defendants in turn argue that the SCA is invalid because it is superseded by the NDA. *See* Docket No. 300 at 7. The NDA states that it "contains the entire agreement of the ('Parties')" such that it supersedes any previous agreement between the Parties. Docket No. 301–7 at 3. The Parties are defined as TLS Management and Marketing Service LLC and Ricky Rodríguez. *Id*. at 1. Consequently, Defendants argue, the NDA superseded the SCA, as it was signed after the SCA was in effect. Docket No. 300 at 7. However, the parties in the SCA are defined as TLS Marketing and Management, LLC and ASG Accounting Solutions Group, Inc. Docket No. 299-15 at 1. As the parties in the NDA are clearly not the same as the parties in the SCA, the signing of the NDA did not affect the continued validity of the SCA.

Therefore, TLS has proven that there are no genuine disputes of material fact that the SCA required ASG and Rodríguez to return TLS's documents and that ASG and Rodríguez did not do

---

[7] The SCA in fact states, "Subcontractor shall return to TLS any Intellectual Property of TLS in Subcontractor's possession[,]" but because both parties agreed that it instead said that the Subcontractor had to return TLS's "Confidential Information," the court will treat that as a stipulated fact. Docket No. 301-16 at 5.

so; summary judgment for TLS's claim for breach of contract on these grounds against ASG and Rodríguez is warranted. As TLS presented no evidence that GOS kept files, summary judgment is appropriate for Defendants on TLS's claim for breach of contract on the same grounds against GOS.

In summary, summary judgment for TLS on the issue of liability is **GRANTED** as to its breach of contract claims against ASG, GOS, and Rodríguez for disclosure of the loan agreement and operating agreement and against ASG and Rodríguez for disclosure of the U.S. Possession Strategy and retention of TLS's Confidential Information. Summary judgment is **GRANTED** for GOS on TLS's breach of contract claims against it for disclosure of the U.S. Possession Strategy and retention of TLS's Confidential Information. Summary judgment on any other grounds is **DENIED** for TLS, ASG, GOS, Rodríguez, and Santo Domingo.

### D.  Conversion

Conversion in Puerto Rico is an intentional tort, a form of the fault described in Article 1802. *Barretto Peat, Inc. v. Luis A. Ayala Colon Sucrs., Inc.*, 709 F. Supp. 321, 323 (D.P.R. 1989) (citing *Fed. Ins. Co. v. Banco Popular de P.R.*, 750 F.2d 1095, 1100 (1st Cir. 1983)), *aff'd*, 896 F.2d 656 (1st Cir. 1990). The existence of liability under Article 1802 requires (1) an act or omission caused through fault or negligence, (2) a damage suffered, and (3) a causal nexus between the damage and the other party's wrongful or negligent act. *Montalban v. Centro Com. Plaza Carolina*, 132 D.P.R. 785, 795–96, 1993 WL 840023 (1993); *Elba A.B.M. v. Univ. of P.R.*, 125 D.P.R. 294, 308, 1990 WL 658047 (1990). In particular, the act of conversion consists of "not the simple acquisition of another's property, but the malicious and wrongful privation of the ownership rights, the illegal exercise, or the assumption of authority over another's property, thereby depriving the lawful owner or possessor, permanently or for an indefinite period, of its use and enjoyment." *Fed. Ins. Co. v. Banco de Ponce*, 582 F. Supp. 1388, 1393 (D.P.R. 1984) (citing *Hull Dobbs Co. v. Superior Court*, 81 P.R.R. 214, 222 (1959), *aff'd*, 751 F.2d 38 (1st Cir. 1984)). While the First Circuit has "recognize[d] that Puerto Rico's 'conversion' precedents are somewhat ambiguous[,] . . . Puerto Rico allows recovery for conversion upon a showing of 'malicious and

wrongful' privation of ownership rights," with reference to "civil law concepts of fault." *Banco de Ponce*, 751 F.2d at 42 (citing *Hull Dobbs*, 81 P.R.R. at 222).

TLS alleges that the same four actions that caused ASG, GOS, and Rodríguez to breach their contracts—using similar buy-sell agreements and loan programs to those of TLS, modifying and using TLS's loan application and operating agreement, using its U.S. Possession Strategy, and keeping kept a copy of TLS's documents—are also grounds for a conversion claim under Article 1802. Docket No. 297 at 7. However, TLS failed to prove that it was the lawful owner or possessor of much of the property and universally failed to show that any taking of its property resulted in the permanent or indefinite loss of its right of "use and enjoyment." *Banco de Ponce*, 582 F. Supp. at 1393. TLS understandably did not argue that it owns or possesses all loan programs and buy-sell agreements that are in any way similar to its own. As to the loan application, operating agreement, U.S. Possession Strategy, and copy of its files, even assuming that TLS did make a sufficient claim to ownership and possession of that property, it failed to put forward any arguments that Defendants' use of that property deprived TLS of its own use and enjoyment. TLS seems to argue that Defendants' possession of copies of TLS's property simultaneous to its own possession of the originals qualifies as causing TLS to lose its right of use and enjoyment, but it has not actually clearly made that argument nor supported it with citations to any law. *Cf. Barretto Peat, Inc.*, 896 F.2d R, 657 (discussing conversion in the context of one party was seeking the return of unique goods); *Westernbank Puerto Rico V. Kachkar*, No. CV 07–1606 (ADC/BJM), 2009 WL 6337949, at *31 (D.P.R. Dec. 10, 2009), report and recommendation adopted, No. CV 07–1606 (ADC), 2010 WL 1416521 (D.P.R. Mar. 31, 2010) (same); *Montalvo v. LT's Benjamin Records, Inc.*, 56 F. Supp. 3d 121, 139 (D.P.R. 2014) (same). As a consequence, TLS failed to make the showing required for summary judgment.

Conversely, Defendants argue that summary judgment on TLS's conversion claim is warranted because TLS failed to make a prima facie case of conversion. Docket No. 309 at 9–10. Specifically, Defendants point to the fact that TLS failed to establish ownership rights over any of the property that it claims was converted and that it did not show that any loss of those ownership

rights was caused by malicious wrongful use by Defendants. *See* Docket No. 300 at 45. In response, TLS claims that the contracts it signed with the Defendants gave it ownership rights over its documents, programs, and its U.S. Possession Strategy and simultaneously created a duty for Defendants to not take and/or return that property. Docket No. 340 at 8–11. Notably, TLS offered no other source of a duty for Defendants to refrain from using its strategies and documents. It is established law that a party cannot support a conversion claim when "damages suffered arise as a consequence of non-compliance with pre-existing contract" and plaintiff cannot demonstrate that "damages also arose from a general (non-contractual) duty not to cause harm." *Westernbank Puerto Rico*, No. CV 07–1606 (ADC/BJM), at *33 (citing *Ramos Lozada v. Orientalist Rattan Furniture, Inc.*, 130 D.P.R. 712, 724–28; 1992 PR–Eng. 755597 (1992)). As all the duties that TLS alleges Defendants owe it are "contractually defined," TLS cannot support a conversion claim. *Id.* (citing *Ramos Lozada*, 130 D.P.R. at 728, 729 (plaintiff landlord could elect to proceed under either contract or tort since defendant's conduct violated both the contract between the parties and an independent duty arising from Puerto Rico landlord/tenant law)). Consequently, summary judgment for Defendants on TLS's conversion claim is **GRANTED**.

### E.  *Tortious Interference*

TLS alleges that Defendants tortiously interfered with its contracts. "The Supreme Court of Puerto Rico has recognized that under article 1802 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5141, a cause of action exists for tortious interference with the contractual obligations of third parties." *Future Dev. of Puerto Rico v. Estado Libre Asociado De Puerto Rico*, 276 F. Supp. 2d 228, 241 (D.P.R. 2003). There are four elements to a tortious interference claim. First, "there must be a contract with which a third person interferes." *General Office Prods. v. A.M. Capen's Sons*, 115 D.P.R. 553, 558–59, 15 P.R. Offic. Trans. 727, 734–735, 1984 WL 270915 (1984) ("an expectation or a profitable financial relationship where there is no contract" is not sufficient to sustain a claim). Second, there must be fault although "the prejudiced party need only show or present facts allowing the court to infer that the third person has acted tortiously, with knowledge of the contract's existence." *Id*. Specifically, "the defendant has to intentionally interfere, knowing

that such interference will injure the plaintiff." *Future Dev. of Puerto Rico*, 276 F. Supp. 2d at 241 (citing *Jusino Figueroa v. Walgreens of San Patricio Inc.*, 2001 TSPR 150, 2001 WL 1414693 (2001)). The third element is that the plaintiff must have suffered damage, and the fourth element is that damage "must be a consequence of the tortious acts of the third person." *General Office Prods.*, P.R. Offic. Trans. at 734.

Defendants seek summary judgment on TLS's claims on that basis that TLS either cannot prove that it had a contract with its alleged clients and associates or, if there was a contract, because TLS cannot prove that Defendants caused any of TLS's damages.

TLS's first allegation is that Rodríguez, ASG, and GOS tortuously interfered with its relationships with its clients: Brad Schumacher, Bob Renguso, and Jay Harris.[8] PSUF ¶¶ 135–138. Defendants concede that TLS had contracts with all three clients. Docket No. 309 at 16; 355 at 6. Defendants also do not contest that ASG, knowing of TLS's contract with them, worked for Schumacher, Renguso, and Harris and assisted them in leaving TLS. PSUF ¶¶ 136–37; DSUF ¶¶ 174–78. However, they rightly argue that TLS has failed to put forth sufficient evidence that ASG's actions caused any damage to TLS because TLS has not shown that ASG's actions were actually the reason for its clients leaving. *See Casiano-Cains v. Coll. of Pub. Performance Producers*, No. CV 13–1110 (DRD), 2013 WL 12234543, at *12 (D.P.R. Sept. 30, 2013) (no causation where plaintiffs could not show either "temporal proximity between the email messages and the end of Televisa's contract, or that the contents of the email messages were in fact the reason for Televisa's decision to end a contractual relationship of over 20 years"). Renguso, Schumacher, and Harris all attested to the fact that they chose to leave TLS for their own reasons, unrelated to ASG. DSUF ¶¶ 172–73 (citing lack of capital, personal fall-out, and personal reasons). Moreover, Rodríguez explained that Renguso and Schumacher "needed to leave the TLS strategy . . . so they hired ASG in order to assist them" while Harris "called me up in order to assist him" develop an exit strategy

---

[8] In its heading for the relevant statements of uncontested material fact, TLS states that Defendants interfered with its relationship with Schumacher, Renguso, Mrs. [Kim] Renguso, and Harris. However, as all of its relevant facts only address Schumacher, Renguso, and Harris, I will only address TLS's claim as it pertains to those three.

from TLS. PSUF ¶¶ 136, 140; Docket No. 301–1 at 267, 332. In the face of evidence that all three clients had their own reasons for cutting ties with TLS and initiated contact with ASG to do so, TLS's vague argument that ASG "successfully prompted several of [its] clients to cut ties with TLS"—without any proof that ASG caused Renguso, Schumacher, or Harris to end their contracts with TLS—is insufficient to create a genuine dispute of material fact as to whether ASG caused any damage to TLS through its relationship with Renguso, Schumacher, and Harris. Docket No. 297 at 13.

TLS also alleges that Rodríguez, ASG, and GOS interfered with its relationships with its clients: Elgin Allen, Lawrence Friedman, and Doug Clancy. PSUF ¶¶ 143–48. However, other than calling them its "clients" TLS has offered no evidence that it had anything more formal than a financial relationship with any of the three individuals. It is not the responsibility of the court to assume that a common word such as client automatically means that TLS had a valid contract with that individual. Moreover, this court has held that even if TLS had made a vague mention to a contract, which it did not, even that would not be enough to make a claim for tortious interference because the contract must also have a "fixed time period." *Burckhart Search Grp., Inc. v. Doral Fin. Corp.*, No. CV. 11–1565 (JAF), 2011 WL 6029817, at *8 (D.P.R. Nov. 30, 2011) (dismissing tortious interference claim when plaintiff failed to "offer any clues as to when the contract began, when it was in effect, or the agreed-upon termination date—or lack thereof. Thus, no liability can lie, as the underlying contract, as alleged, 'has no fixed period of time'" (quoting *A.M. Capen's Co., v. Am. Trading and Prod. Corp.*, 200 F.Supp.2d 34, 48 (D.P.R.2002))). As "the existence of a contract is an indispensable requirement in tortious interference actions" and because TLS has provided the court with no evidence that it had a contract with any of these three clients (or even state that they do), TLS has failed to make a prima facie case of tortious interference. *Future Dev. of Puerto Rico*, 276 F. Supp. 2d at 242 (dismissing tortious interference claim when plaintiff did not point to the "particular contract" it had with the third parties).

Similarly, TLS argues that Rodríguez, ASG, and GOS interfered with its relationships with its associates: Todd Mardis, Frank DeVincent, David Pulling, Cliff Morgan, Todd Thomae, Tim

Kissling, and Walt Dallas. PSUF ¶¶ 151–175. TLS's sole alleged connection to Frank DeVincent, David Pulling, and Tim Kissling is that they are "TLS referral source[s]." PSUF ¶¶ 159, 168, 173. TLS's sole alleged connection to Cliff Morgan, Todd Thomae, and Walt Dallas is that they are all "TLS channel[s] and associate[s]." PSUF ¶¶ 170, 175. Finally, TLS refers to Todd Mardis as a "TLS channel, referral source, and subcontractor." PSUF ¶ 151. While perhaps closer to alluding to an actual contractual relationship with Mardis as he was a "subcontractor," TLS failed to allege, let alone present evidence, that it had a fixed time period contract with any of its associates. *See Burckhart Search Grp., Inc.*, No. CV. 11–1565 (JAF), at *8. As discussed above, these vague connections to third parties are insufficient to establish that TLS had a contractual relationship that could support a claim for tortious interference.

Finally, TLS argues that Defendants interfered with its relationship with its client, Ora Goldman. PSUF ¶ 149. But TLS again fatally failed to prove that it had a valid contract with a fixed time period with Goldman. PSUF ¶ 149. Even assuming that Rodríguez's statement that Goldman "has a CHIC with or through TLS" satisfied these requirements, TLS has alleged no damage that it suffered because of Defendants' contact with Goldman. PSUF ¶ 149. TLS never alleges that it lost Goldman's business or that their business relationship even soured; simply stating that Rodríguez, ASG, and GOS met with Goldman and "discussed Act 20" does not create a genuine dispute of material fact that TLS suffered any damage or that Rodríguez, ASG, and GOS were the cause of that damage. PSUF ¶ 150. As TLS has failed to make out a prima facie case for tortious interference with its contractual relationships, summary judgment for Defendants on TLS's tortious interference claims is **GRANTED**.

As a final order of business, Defendants argue that the claims against Ramos must be dropped. Docket No. 300 at 24. Although the Wiretap Act claim against her and the other defendants still remains, TLS has not argued that Ramos is implicated in any of its other causes of actions. In fact, TLS's entire response to Defendants' motion for summary judgment does not mention any actions by Ramos individually, and its own motion for summary judgment does not include Ramos's name outside of its Wiretap Act claim. Docket Nos. 297, 340. Therefore, TLS's

causes of action against Ramos, other than under the Wiretap Act, are **DISMISSED**. Moreover, although Santo Domingo did not oppose TLS's motion for summary judgment, it is clear that the arguments raised by the other defendants would apply to him with equal weight. As such, the case will proceed against him as to TLS's claims for breach of contract and violations of the Wiretap Act and the Act. TLS's claims against Santo Domingo for conversion and tortious interference will be **DISMISSED**.

### CONCLUSION

For the foregoing reasons, TLS's motion to for summary judgment and Defendants' motion for summary judgment are both **GRANTED** in part and **DENIED** in part. Summary judgment is **DENIED** on TLS's claims under the Wiretap Act and the Act. Defendants' motion for reconsideration is **DENIED**. Summary judgment for TLS as to the issue of liability is **GRANTED** on its breach of contract claims against ASG, GOS, and Rodríguez for disclosure of the loan agreement and operating agreement and against ASG and Rodríguez for disclosure of the U.S. Possession Strategy and retention of TLS's Confidential Information. Summary judgment is **GRANTED** for GOS on TLS's breach of contract claims against it for disclosure of the U.S. Possession Strategy and retention of TLS's Confidential Information. Summary judgment on all remaining claims for breach of contract is **DENIED**. Summary judgment is **GRANTED** for Defendants on TLS's conversion claim and tortious interference claim. TLS's causes of action against Ramos, other than under the Wiretap Act, are **DISMISSED**.

Accordingly, what remains for trial are TLS's claims under the Wiretap Act against all parties; TLS's claims under the Act against all defendants except Ramos; TLS's breach of contract claim against all defendants except Ramos for using similar buy-sell agreements and loan programs; and the issue of appropriate remedies for TLS's breach of contract claims on which TLS was granted summary judgment for the issue of liability.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 29th day of March, 2018.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge